UNITED STATES of America, Appellee,

v.

Norman ARCHER et al., Defendants-Appellants.

Nos. 1039, 1040, 1041, Dockets 73–1527, 73–1528, 73–1711.

United States Court of Appeals, Second Circuit.

Argued June 22, 1973.

Decided July 12, 1973.

Rehearing Denied Sept. 26, 1973.

Irving Anolik, New York City, for defendant-appellant Norman Archer.

Milton S. Gould, New York City (Shea, Gould, Climenko & Kramer, New York City, of counsel), for defendant-appellant Frank R. Klein.

John L. Pollok, New York City (Edward Gasthalter, and Lenefsky, Gallina, Mass, Berne & Hoffman, New York City, of counsel), for defendant-appellant Leon Wasserberger.

Richard Ben-Veniste, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty. for the S. D. of New York, Rudolph W. Giuliani, John W. Nields, Jr., John D. Gordan III, Kenneth R.

Feinberg and Richard J. Davis, Asst. U. S. Attys., of counsel), for appellee.

Maurice H. Nadjari, Deputy Atty. Gen., Peter J. O'Connor, Sp. Asst. Atty. Gen., for the Office of Special Prosecutor, State of New York, amicus curiae.

Frank S. Hogan, Dist. Atty., New York County, Alfred J. Scotti, Chief Asst. Dist. Atty., and Michael R. Juviler, Asst. Dist. Atty., amicus curiae.

Michael Armstrong, Dist. Atty., Queens County, amicus curiae.

Before FRIENDLY, FEINBERG and MANSFIELD, Circuit Judges.

HENRY J. FRIENDLY, Circuit Judge:

This case arises from what the Government characterizes as "part of an intensive combined Federal and local investigation into the nature and extent of corruption within the New York criminal justice system." Its brief tells us that the investigation "was premised on the belief that attempts to combat corruption in the criminal justice system"—to wit, New York City's— "through uncovering incidents of past wrongdoing had failed." It was essential, the Government insists, to arrange "undercover penetration into ongoing corrupting activities" by having "a federal agent assume the role of a potential consumer of corruption." We do not at all share the Government's pride in its achievement of causing the bribery of a state assistant district attorney by a scheme which involved lying to New York police officers and perjury before New York judges and grand jurors; to our minds the participants' attempt to set up a federal crime for which these defendants stand convicted went beyond any proper prosecutorial role and needlessly injected the Federal Government into a matter of state concern.[1] However, we base our reversal of these convictions and our instruction to dismiss the indictment on the more limited ground that the Government did not provide sufficient proof of use or agreement to use interstate or foreign telephone facilities to satisfy the requirements of the so-called "Travel Act," 18 U.S.C. § 1952.

I.

The plan for setting up a crime was conceived at a February 1972 meeting attended by Thomas Taylor, the Regional Director of the Bureau of Narcotics and Dangerous Drugs (BNDD); several special agents of the Bureau, including one Sante A. Bario; Vincent Murano, a New York City police officer; and two Assistant United States Attorneys for the Southern District of New York. According to the plan, Bario would assume the name Salvatore Barone and pose as a resident alien and member of the Las Vegas underworld. Murano would then "arrest" Bario in Queens County on the phony charge of the unauthorized possession of two loaded pistols, a felony under § 265.05 of the New York Penal Law. After his arraignment, Bario would make it known that he would be willing to pay a considerable sum to avoid trial or conviction on the charge. With Bario as bait, the planners hoped that some evidence of corruption would surface and that some use of interstate facilities would occur or could be arranged so that the incident of corruption would be transformed into a violation of the Travel Act.

Pursuant to the scheme, Taylor gave Bario two loaded pistols, a fake Nevada driver's license, and a false immigration card issued by the Immigration and

---

1. A special prosecutor has since been named by the Governor of New York to investigate precisely the kind of corruption in offices of New York City district attorneys at which the federal prosecutor's activities here were aimed.

The act of bribery that formed the basis for the federal prosecution here was not itself a federal crime, but a violation of §§ 200.00 and 200.10 of the New York Penal Law McKinney's Consol.Laws, c. 40. That violation became a federal offense, according to the Government's theory, when interstate facilities were used to aid in committing it.

Naturalization Service in Washington at the request of the Director of the BNDD. The next morning Murano effected the staged arrest at a diner in Queens. Murano then took Bario to a precinct house and filed a complaint and arrest affidavit falsely charging him with the unauthorized possession of loaded weapons.[2] Bario, in turn, lied about his name, his address, his marital status and his employment, produced the false Nevada driver's license and immigration card, and then certified to the correctness of the false report he had made. When a police officer at the precinct became suspicious about the immigration card, Bario had Murano call Taylor so that the latter could arrange for appropriate falsification of records in the Immigration and Naturalization Service in Washington. Subsequent to arraignment in Queens County Criminal Court, at which Bario lied about his identity, he was admitted to bail. A special agent of the Bureau of Narcotics, posing as Bario's father, "C. Barone," subsequently posted Bario's bail, which had been set at $5,000. After three adjournments, a preliminary hearing was waived and the case was forwarded for presentation to the grand jury.

Nicholas DiStefano, a figure not unknown to this court, see United States v. DiStefano, 464 F.2d 845 (2 Cir. 1972), who, the Government tells us, "was cooperating in a limited manner with the United States Attorney's Office," was then brought upon the stage. On April 19, DiStefano introduced Bario to defendant Wasserberger, an associate of a Manhattan bail bondsman. Wasserberger told Bario he was aware of the latter's arrest and had already spoken to a Queens attorney with "big connections," to wit, defendant Klein. Bario responded that he was "not interested just in any lawyer," but was "under the opinion that something more effective could be done." Wasserberger repeated that

Klein had "strong connections" and that he could "do something" for Bario. When Wasserberger suggested that they drive to Klein's office, Bario agreed. While enroute, Wasserberger told Bario "it was too bad the case went before the grand jury, because it could have been taken care of before the lower court." Bario then said he "could not afford to be seen in a courtroom" and asked "what could be done." Wasserberger answered that they must try to "get the case kicked out before it went any further."

On meeting Klein, Bario first declined a proposal that he plead to a misdemeanor charge. Klein then echoed Wasserberger's advice that "the only thing then left to do was to have the grand jury return no indictment." To arrange that, Klein added, would cost a lost of money —probably between $10,000 and $15,000 in cash. He sought a telephone number where he could reach Bario in Las Vegas; Bario responded, truthfully for once, that he would be out of the country and that he would call Klein instead. Klein promised to have "an answer" by April 25 at the latest. Bario then paid Klein a $500 "retainer" and departed with Wasserberger. On the ride back to Manhattan, Wasserberger explained that part of the total payment would have to go to the assistant district attorney who would be in charge of the presentation to the grand jury. When Wasserberger asked how he could reach Bario in Las Vegas if that became necessary, Bario responded that he could be contacted by paging at the Sahara Hotel or, if that did not succeed, by leaving a message with the hotel telephone operator. In fact, Bario had no contacts whatsoever with the hotel.

On April 25 Bario, who had gone to France on a genuine narcotics investigation, called Klein from Paris. Klein arranged a meeting at his office for April 27, at which time he said he would have some news. Bario then flew back. Ear-

---

2. Murano testified that he had done all this on the instructions of the two Assistant United States Attorneys.

ly on the morning of April 27 Bario and Murano, on instructions from an Assistant United States Attorney, went to a hotel in Newark, N. J., admittedly for the sole purpose of having Klein talk in an interstate telephone call. The calls began before 8 A.M., and were repeated every ten to fifteen minutes. At around 9 A.M., someone answered, and Bario asked that Klein return the call to him in Newark. Later that morning, Klein did.

Bario met Wasserberger and Klein at the latter's office later in the day. Klein reported that he had been in touch with the Queens assistant district attorney in charge of the grand jury, and that the latter, who turned out to be defendant Archer, had suggested that Klein create a fictitious story to afford some justification for Bario's possession of the guns. The three men concocted a story whereby Bario would testify he was carrying cash as a "junket coordinator" for a Las Vegas hotel and was obliged to carry a pistol, for which he had a Nevada license; Klein and Wasserberger both assured Bario that no one would check the details. The story invented to justify possession of the second pistol was considerably more preposterous; Bario would explain that he was carrying the gun for a friend overnight so that the friend could avoid upsetting a young woman with whom he had a date. Klein then informed Bario that the grand jury hearing was scheduled for May 8. The total price was fixed at $15,000 in cash, including the $500 that Bario had already paid. Klein insisted that Bario deliver the $14,500 balance to him on May 5. Bario's plan to lie to the grand jury was disclosed to the Assistant United States Attorneys and sanctioned by them.

On May 5, Bario made an intrastate call to Wasserberger to postpone delivery of the $14,500. Wasserberger said he had been trying unsuccessfully to call Bario at the Sahara Hotel in Las Vegas in order to tell him that the grand jury appearance had been postponed from May 8 to May 9; it was agreed that the cash should be delivered on May 8. On that date, Bario delivered the money to Klein in marked bills, and Klein placed it in his safe deposit box.

After a dress rehearsal in Klein's office shortly after noon on May 9, Bario went to the grand jury room with Klein and Wasserberger. While the three were sitting in the waiting room, Klein pointed out Archer and said, "That's our man." Before the grand jury, Murano was first called to testify as to the details of the arrest. Bario then told his contrived tale, except that he did not mention the Nevada permit. Archer elicited that fabrication and led Bario as the latter denied awareness that the Nevada permit did not entitle him to carry a gun in New York. The plan threatened to miscarry when a grand juror asked whether the existence of the Nevada pistol license had been verified, but Archer stepped into the breach by falsely asserting that it had. Before the grand jury retired, Archer made a statement minimizing Bario's offense and adding, untruthfully, that Murano had expressed some doubt whether his observation of the guns had been adequate to justify Bario's arrest. The grand jury returned no true bill. Following the successful culmination of the scheme, Government agents observed an encounter between Klein and Archer. About a month later they terminated their investigation by conducting searches, pursuant to warrants, of Archer's home and Klein's safe deposit box. On the view we take of the case, it is unnecessary to treat these events in detail.

## II.

Mere recital of the facts in this case inevitably calls to mind the celebrated passage in the alternative ground of Mr. Justice Brandeis' dissent in Olmstead v. United States, 277 U.S. 438, 485, 48 S. Ct. 564, 575, 72 L.Ed. 944 (1928):

Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, ex-

istence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

Justice Brandeis' statement is eloquent but his view, taken in full breadth, has never commanded the support of a majority of the Supreme Court. In *Olmstead* itself this portion of his dissent was joined only by Mr. Justice Holmes and Mr. Justice Stone.[3] While the first ground of the dissent, namely, that warrantless wiretapping violates the Fourth Amendment, 277 U.S. at 471–479, 48 S.Ct. 564, has since been vindicated, Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), there has been no corresponding adoption of the second, based on the criminality of the acts of the Government agents under the laws of the State of Washington, 277 U.S. at 479–480, 48 S.Ct. 564. From Casey v. United States, 276 U.S. 413, 48 S.Ct. 373, 72 L.Ed. 632 (1928), decided two months before *Olmstead,* to Russell v. United States, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d

366 (1973), decided this year, the Court has steadfastly refused to rule that governmental participation in a crime necessarily vitiates the conviction of private individuals who took part in committing the offense. In *Casey,* the Court affirmed (per Mr. Justice Holmes) a conviction in a case where federal narcotics officers induced prisoners to request their attorney to supply them with narcotics for which the prisoners paid with sums advanced by the Government. Only Justices Brandeis and Butler dissented on the grounds of the Government's conduct. Yet *Casey,* like other entrapment cases where the Government has prevailed, is distinguishable from this case in several respects. In *Casey* the jailer suspected that a federal crime was being committed by a specific individual; here, as far as appears, the instigators of the scheme had only a generalized belief that something was rotten in the Queens County District Attorney's office. Furthermore, in *Casey,* as in the more common cases where federal undercover agents have induced the sale of narcotics, the criminal activity in which the Government agents participated was the very activity for which the defendant was prosecuted. Finally, in cases of that sort, the Government agents have actually not committed a crime at all since they have had no criminal intent.[4] In this case, by contrast, the Government "authorized" Bario and Murano to engage in crimes under New York law,[5] several of them prior to the discovery of any criminal activity on the part of the defendants and quite independent of the crimes the defendants committed.

---

3. Mr. Justice Butler, who joined in the portion of the dissent relating to the Fourth Amendment, thought the "dirty business" issue was not properly before the Court. 277 U.S. at 486, 48 S.Ct. 564.

4. There are, of course, cases where agents intend to keep some or all of the purchased narcotics and make a later sale, but the government obviously is not a party to that intent.

5. The Government argues that no one was hurt by the state crimes committed

by Bario and Murano since in fact there had been no actual violation of New York's gun law, Penal Law § 265.05. The Government would distinguish this case from one where federal agents were instructed to deny a state crime that had in fact been committed. In its view the waste of the time of New York police officers, judges and grand jurors in considering a fictitious crime was more than counterbalanced by the results achieved.

The Government relies heavily on the recent decision in Russell v. United States, *supra,* where the Court reaffirmed the "subjective" view of the entrapment defense taken by the majority in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), and repeated in Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L. Ed.2d 848 (1958). By a 5–4 vote, the Court rejected the contention that the entrapment defense should focus primarily on the propriety of police behavior in inducing the defendant to commit a crime. The Ninth Circuit in *Russell* had reversed the defendant's conviction for illegally manufacturing methamphetamine because the Government agent had supplied Russell with the essential chemical ingredient required for producing the drug. This behavior, the court wrote, constituted "an intolerable degree of governmental participation in the criminal enterprise." 459 F.2d at 673. In reversing, Mr. Justice Rehnquist wrote for the Court that at least in drug-related offenses, "infiltration of drug rings and a limited participation in their unlawful present practices" is permissible, as it is "the only practicable means of detection. 411 U.S. at 431, 93 S.Ct. at 1643. Moreover, the Court pointed out that in *Russell* the Government agent had violated no independent constitutional right of the defendant and, by merely providing the ingredients for the illegal process, he did not violate any federal statute or commit any crime. Finally, in holding that entrapment takes place only when the government's deception "actually implants the criminal design in the mind of the defendant," the Court admonished that the defense "was not intended to give the federal judiciary a 'chancellor's foot' veto over law enforcement practice of which it did not

approve." 411 U.S. at 434, 93 S.Ct. at 1644.

The defendants have attempted to distinguish *Russell* on the ground that there the Government's participation in the criminal enterprise was limited, while here it was pervasive. They point particularly to Mr. Justice Rehnquist's *caveat,* 411 U.S. at 431, 93 S.Ct. at 1643, that the Court might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) . . ." The Government responds that the citation of *Rochin,* where the Court, under the due process clause, set aside a state conviction because of police conduct involving "[i]llegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents," 342 U.S. at 172, 72 S.Ct. at 209, shows that Mr. Justice Rehnquist was thinking of conduct *directed at the defendants* which shocked the conscience of the Court even though it did not come within any "specific" of the Bill of Rights. No such "direct and immediate infringement of the rights of a defendant" occurred here, the Government insists.

■■ We are not sure how we would decide this question if decision were required. Our intuition inclines us to the belief that this case would call for application of Mr. Justice Brandeis' observation in *Olmstead.* Even though that view has not been incorporated in the entrapment defense, there is certainly a limit to allowing governmental involvement in crime.[6] It would be unthinkable, for ex-

---

6. While some passages in *Russell* strongly suggest that courts should abstain from overturning convictions because of law enforcement tactics that do not appeal to them, see 411 U.S. at 432, 93 S.Ct. 1637, the Court made it clear that the entrapment defense would not be the only means for a defendant to contest the propriety of police practices utilized to apprehend him. Besides the reference to *Rochin,* the Court noted that law enforcement practices would remain subject to "constitutional and statutory limitations and to judicially fashioned rules

ample, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental "investigation" involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction. Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality.

In this case the Government argues, its conduct did not infringe the rights either of the defendants or of any third parties; see fn. 5. Yet the Government agents displayed an arrogant disregard for the sanctity of the state judicial and police processes. The investigators apparently permitted their deserved contempt for corrupt practitioners in the Queens criminal justice system to spill over into disdain for all the participants in the system—including the police, the courts, and the members of the grand jury, all of whom were subjected to the Government's fabrications. While this pattern of deception may be less serious than some forms of governmental participation in crime that can be hypothe-sized, it is substantially more offensive than the common cases where government agents induce the sale of narcotics in order to make drug arrests.

Since we conclude reversal to be required on another ground, we leave the resolution of this difficult question for another day. We hope, however, that the lesson of this case may obviate the necessity for such a decision on our part.

## III.

We take a similar view with respect to the question whether this prosecution should be dismissed because the initiation of the investigation was founded on a grossly inflated conception of the role of the federal criminal law. There is no evidence that, at the time of the February 1972 meeting, the federal law enforcement officers had any information that the supposed corruption of the Queens County District Attorney's office involved violations of the Travel Act, 18 U.S.C. § 1952; [7] the hope was rather that if the playing of the Bario-Murano scenario would induce corrupt activity, some interstate or foreign element might occur or, if not, might be injected.[8] Today there is widespread concern whether the federal criminal law has not outrun reasonable bounds;

---

to enforce those limitations." *Id.* It is doubtful, however, that the constitutional principles in this area will be any less "unmanageably subjective" than the entrapment decisions Mr. Justice Rehnquist criticized. In his concurring opinion in Williamson v. United States, 311 F.2d 441, 445 (5 Cir. 1962), the celebrated "contingent-fee informer" case, Judge Brown gave vent to the frustration of trying to draw lines between permissible and impermissible forms of undercover activity: "What we hold is that, recognized as is the role of informer in the enforcement of criminal laws, there comes a time when enough is more than enough—it is just too much."

7. Subsequent to oral argument, the Government informed us by letter that the United States Attorney's office had "advised a high New York State Court official of the investigation, the need therefor, and the techniques to be em-ployed in the undercover arrest of a federal agent," although conceding that not "all facets of the investigation as they later developed were communicated to the court." But it is not for an unnamed state court official to determine the proper scope of federal law enforcement.

8. Counsel for the Government suggested at argument and repeated in the letter mentioned in fn. 7 that corruption in any local prosecutor's office provides a safe harbor for organized crime, which almost inevitably crosses state lines. While this may be so, the proper course for federal officers would seem to be to aim the investigation at the organized crime. In this case the Government alleges only that it was aware of "the existence of corruption in high places," and not who was engaged in it or whether it involved any interstate activity whatsoever.

"Federal auxiliary criminal jurisdiction" has spread to the point where "[t]here is practically no offense within the purview of local law that does not become a Federal crime if some distinctive Federal involvement happens to be present." See N. Abrams, Consultant's Report on Jurisdiction, 1 Working Papers of the National Commission on Reform of Federal Criminal Laws, 33, 36 (1970). Although § 207 of the Commission's Proposed Code, entitled "Discretionary Restraints on Exercise of Concurrent Jurisdiction," includes among the cases where "a substantial federal interest exists," the instance in which "state or local law enforcement has been so corrupted as to undermine its effectiveness substantially," it is not clear that this comprehends a case where federal investigators have no reason to suspect any violation of federal law. Even if the proposed code section was intended to cover such cases, we are not sure we would agree that the federal interest should extend that far.

 While responsibility for keeping federal criminal investigations and prosecutions within the bounds appropriate on the assumptions inherent in a federal system should rest, in the first instance, with United States Attorneys under the active guidance of the Attorney General, see Friendly, Federal Jurisdiction: A General View 55–61 (1973), we are not prepared to say that, absent Congressional limitation, a federal court may never dismiss a prosecution as an abuse of federal power, see Hart & Wechsler, The Federal Courts and the Federal System 1287 (2d ed. 1973). However, we find it unnecessary to decide whether we have such a power or should exercise it here, since we hold these convictions must be reversed on another, although not unrelated, ground.

## IV.

In determining whether the three interstate or foreign telephone calls in this case sufficed to trigger application of the Travel Act, it is well to have the language of the statute before us; we have reproduced the pertinent portions in the margin.[9]

One is immediately struck by the excess of the spread of the language of the statute over the title. The title refers only to interstate and foreign travel or transportation; yet the text also includes the use of any facility in interstate or foreign commerce. The title refers only to acts "in aid of racketeering enterprises"; yet the definition of "unlawful activity" in the text displays no such limitation. The legislative history affords little indication of Congressional awareness of the enormous reach the statute could have if literally interpreted. Indeed, there is even some evidence that Congressional inadvertence contributed to the expansion in the scope of the Act as it made its way through the House and Senate committees, see fn. 10 *infra.*

9. *Interstate And Foreign Travel Or Transportation In Aid Of Racketeering Enterprises.*
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
 (1) distribute the proceeds of any unlawful activity; or
 (2) commit any crime of violence to further any unlawful activity; or
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
 (b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or controlled substances (as defined in section 102(6) of the Controlled Substances Act) or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

The source of the statute, which was adopted with remarkable speed and little discussion, was a bill forwarded to Congress by Attorney General Kennedy on April 6, 1961. His letter of transmittal urged that:

> Because many rackets are conducted by highly organized syndicates whose influence extends over State and National borders, the Federal Government should come to the aid of local law enforcement authorities in an effort to stem such activity.

87th Cong. 1st Sess., S.Rep.No.644 at p. 4; H.R.Rep.No.966, reprinted in 2 U.S. Code Cong. & Adm.News pp. 2664, 2666 (1961). He told the Senate Judiciary Committee that the Act was necessary to aid local law enforcement officials in many instances where "the 'top men' of a given criminal operation resided in one State but conducted their illegal activities in another." Hearings on S. 1653–1658, S.1665 before the Senate Judiciary Committee on the Attorney General's Program to Crush Organized Crime and Racketeering, 87th Cong. 1st Sess. (1961) at 15–17 quoted in United States v. Nardello, 393 U.S. 286, 290–291, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969). The target of the Act, he said, "clearly is organized crime." The statute would not curtail "the sporadic, casual involvement in these offenses, but rather a continuous course of conduct sufficient for it to be termed a business enterprise." S.Rep.No.644, at 3. See Rewis v. United States, 401 U.S. 808, 811–812 n. 6, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). In his testimony before the House committee, the Attorney General "cited numerous instances of the use of the facilities of interstate commerce by racketeers and hoodlums to promote the illegal enterprises, to distribute the proceeds among the syndicate members of illegal gambling, liquor, narcotics, and prostitution businesses and the use of the facilities for the commission of crimes of violence in furtherance of the unlawful activities." H.R. Rep.No.966, 2 U.S.Code Cong. & Adm. News, *supra* at p. 2665. Yet the bill he submitted, if read literally, would cover a $10 payment to fix a traffic ticket if only the person desiring the fix walked across a state line to pay off the policeman.

The Senate did nothing to narrow the language to the stated purpose. 107 Cong.Rec. 13942–44 (1961). The House tried to do so by amending what is now· § 1952(b)(2) to read "extortion or bribery *in connection with such offenses*" (emphasis supplied), to wit, gambling, liquor, narcotics or prostitution offenses "in violation of the laws of the State in which they are committed or of the United States." H.R.Rep.No.966, 2 U. S.Code Cong. & Adm.News, *supra* at p. 2667. But the Senate, responsive to an objection from the ·Department of Justice that the House amendment would eliminate "offenses such as 'shakedown rackets', 'shylocking' and labor extortion which were traditional sources of income for organized crime," United States v. Nardello, *supra,* 393 U.S. at 292, 89 S. Ct. at 537, refused to agree to the change; the House Managers yielded, 107 Cong.Rec. 18814–15 (1961), and the bill was adopted in substantially its present form.[10]

---

10. Possibly through inadvertence, the House substantially increased the scope of the Travel Act during its rush toward passage. The original bill, as submitted by the Attorney General, covered only interstate and foreign *travel*. At the urging of Senator Keating, the Senate Judiciary Committee added a section covering *transportation* in interstate and foreign commerce. The Senate Committee also revised the title to its current form to reflect the change, S.Rep. No. 644, at 1, 4, and the Senate passed the bill in that form. In attempting to tidy up the language of the bill, however, the House Committee expanded its scope considerably. Purporting merely to combine the two sections of the Senate bill into a single section, the House Committee substituted the present language extending the coverage of the Act to "whoever *travels* in interstate commerce or *uses any facility* in interstate commerce, including the mail . . . ." The Committee demonstrated its unawareness of the

It would go beyond the proper exercise of judicial power for courts to confine the Travel Act to its title, see Fraser v. United States, 145 F.2d 139, 142 (6 Cir. 1944), cert. denied, 324 U.S. 849, 65 S.Ct. 684, 89 L.Ed. 1409 (1945), or even to the precise purpose stated to Congress by the Attorney General. Nonetheless, the question remains whether the defendants here have used a facility in interstate or foreign commerce, for the purposes listed in § 1952(a)(3), in a sufficiently meaningful way to subject themselves to liability under the statute. In deciding that limited issue, we are free, indeed bound, to look to the legislative history, to consider the demands of federalism, and to heed the venerable rule, reaffirmed by the Supreme Court with respect to this very statute, that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." Rewis v. United States, *supra,* 401 U.S. at 812, 91 S.Ct. at 1059.

While the precise holding of *Rewis* was that the proprietors of a Florida gambling establishment did not violate the Travel Act merely because some of their customers came from Georgia, a course of action foreseeable and even designed, the opinion indicates that the Act is not to be stretched to the limits of its language. The Court stated, 401 U.S. at 811, 91 S.Ct. at 1059, that the legislative history revealed "that § 1952 was aimed primarily at organized crime and, more specifically, at persons who reside in one State while operating or managing illegal activities located in another." The warnings that "Congress would certainly recognize that an expansive Travel Act would alter sensitive federal-state relationships" and "could overextend limited · federal police resources," 401 U.S. at 812, 91 S.Ct. at 1059, are not without relevance here. These observations were reiterated in Erlenbaugh v. United States, 409 U.S. 239, 247 n. 21, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972).

Of our own decisions under the Travel Act, the most illuminating for present purposes is United States v. Corallo, 413 F.2d 1306 (2 Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969). Although that case, like this one, involved corruption of a local official, the evidence there disclosed numerous telephone calls from New York to Connecticut for the very purpose of arranging the bribe and distributing the proceeds among the conspirators, 413 F. 2d at 1315. On that basis Judge Medina concluded, 413 F.2d at 1325, that "the extensive references in the record to interstate telephone calls that were actually made justify the inference that the use of interstate telephone calls was not a casual and incidental occurrence but the fulfillment of an integral part of the conspiratorial consensus." In United States v. DeSapio, 435 F.2d 272 (2 Cir. 1970), cert. denied, 402 U.S. 999, 91 S. Ct. 2170, 29 L.Ed.2d 166 (1971), the interstate acts were much less numerous, see 435 F.2d at 275–276, 278, but one of them, the meeting at Fried's horsefarm,

significance of the alteration by reporting that the amendment made "no substantive change in the provisions of the bill" and by retaining the Senate's more restrictive title. H.R.Rep. No. 966, 2 U.S.Code Cong. & Adm.News, *supra* at p. 2664. The conference committee failed to catch the change; it agreed to the House's amendment because of the cosmetic value of adding a single streamlined section to title 18 rather than two cumbersome, largely repetitive ones. H.R.Rep. No. 1161, 107 Cong.Rec. 18814–15 (1961). In construing § 1952, the courts have perforce read the statutory language to mean just what it seems to mean, and have uniform-

ly applied the Travel Act to interstate telephone calls as well as interstate travel and transportation. See, *e. g.,* United States v. Armiento, 445 F.2d 869 (2 Cir.), cert. denied, 404 U.S. 853, 92 S.Ct. 94, 30 L.Ed.2d 93 (1971); Menendez v. United States, 393 F.2d 312 (5 Cir. 1968), cert. denied, 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 572 (1969); McIntosh v. United States, 385 F.2d 274 (8 Cir. 1967). However, the legislative background at least indicates that Congress did not regard the use of interstate facilities for purposes other than travel or transportation as among the central targets of the Act.

which was reached by interstate travel at his suggestion, was the occasion when, on the Government's proof, the entire conspiracy was hatched.[11] In United States v. Cassino, 467 F.2d 610, 613–614 (2 Cir. 1972), cert. denied, 410 U.S. 928, 93 S.Ct. 1363, 35 L.Ed.2d 590 (1973), several of the conspirators engaged in weekly travel from New York to New Jersey for meetings in furtherance of the conspiracy. Finally, in our most recent encounter with the Travel Act, United States v. Kahn, 472 F.2d 272, 285 (2 Cir. 1973), where there was extensive interstate travel and use of the mails, Judge Smith distinguished *Rewis* and the Seventh Circuit decisions cited below on the ground that in them "the defendants themselves engaged in no interstate activities, and that the total interstate travel aspect of the enterprises was either marginal or unforeseen."

Of the other circuits the Seventh has had most to say concerning how purposeful and important to the enterprise the use of interstate facilities must be. United States v. Altobello, 442 F.2d 310 (7 Cir. 1971), held it was not enough that a Philadelphian who was the victim of extortion in Chicago gave as part payment the proceeds of a check he cashed on a Philadelphia bank, which cleared through the mails.[12] In United States v. McCormick, 442 F.2d 316, 318 (7 Cir. 1971), an Indiana lottery operator advertised in a local newspaper for salesmen, and some copies of the newspaper were mailed out of the state. The court again refused to permit application of the Travel Act, finding that "the activities engaged in by defendant were essentially local" and that the role

played by the interstate mailings was "a matter of happenstance" and "minimal and incidental" to the operation of the illegal lottery. The decision in United States v. Lee, 448 F.2d 604, 607 (7 Cir. 1971), cited by the Government, indicates no contrary view; in that case employees of an Indiana gambling establishment regularly crossed state lines, and the court distinguished both *Altobello* and *Rewis* by pointing to the "continual interstate travel by employees of the illegal venture." Two cases from other circuits holding the interstate aspect insufficient are United States v. Hawthorne, 356 F.2d 740 (4 Cir.), cert. denied, 384 U.S. 908, 86 S.Ct. 1344, 16 L.Ed.2d 360 (1966) [moving self and family from Indiana to West Virginia where illegal gambling enterprise was to be undertaken]; and United States v. Judkins, 428 F.2d 333 (6 Cir. 1970) [calls from Arkansas to appellant's house of prostitution in Tennessee not shown to have a business purpose].

It is with this background that we consider the three telephone calls which the Government claims to have brought this case within 18 U.S.C. § 1952(a)(3).

We begin by discarding Klein's return of Bario's calls from Newark on the morning of April 27. Whatever Congress may have meant by § 1952(a)(3), it certainly did not intend to include a telephone call manufactured by the Government for the precise purpose of transforming a local bribery offense into a federal crime. In view of the totally fabricated nature of this episode, it is immaterial that Klein returned the call rather than receiving it as the Government had plotted. The

---

11. Examination of the briefs in the *DeSapio* appeal confirms the writer's recollection that no issue concerning the applicability of the Travel Act was raised. This was also true in United States v. Pordum, 451 F.2d 1015 (2 Cir. 1971), cert. denied, 405 U.S. 998, 92 S.Ct. 1249, 31 L.Ed.2d 467 (1972).

12. The Fourth Circuit cases seem contra on this point. United States v. Salsbury, 430 F.2d 1045 (4 Cir. 1970), held that

cashing out-of-state checks, with knowledge that they would be cleared through the mails was sufficient to invoke the statute. This followed the earlier decision in United States v. Wechsler, 392 F.2d 344 (4 Cir.), cert. denied, 392 U.S. 932, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968) ("When one deposits a check, there would seem to be little doubt that he is using a facility in interstate commerce." *Id.* 392 F.2d at 347 n. 3).

Government's reliance on United States v. Edwards, 366 F.2d 853, 867–868 (2 Cir. 1966), cert. denied, 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967), is misplaced. There this court found that the participants "never considered themselves limited by New York boundaries" and indeed had suggested that the stolen securities be disposed of outside New York; moreover, the issue of the manufacture of federal jurisdiction had not been raised at trial. It is not a sufficient answer that if the issue here were simply one of entrapment, the jury would have been justified in finding, under the entirely correct instruction on the subject given by the judge, that Klein had a propensity for crime, requiring no encouragement from the federal agents. Our holding is rather that when Congress responded to the Attorney General's request to lend the aid of federal law enforcement to local officials in the prosecution of certain crimes, primarily of local concern, where the participants were engaging in interstate activity, it did not mean to include cases where the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present. Manufactured federal jurisdiction is even more offensive in criminal than in civil proceedings, cf. 28 U.S.C. § 1359. As the late Judge Freedman said with respect to civil actions in McSparran v. Weist, 402 F.2d 867, 873 (3 Cir. 1968) (en banc), cert. denied, 395 U.S. 903, 89 S.Ct. 1739, 23 L.Ed.2d 217 (1969), manufactured jurisdiction "is a reflection on the federal judicial system and brings it into disrepute."

Similar considerations lead us to reject the Government's reliance on Wasserberger's unsuccessful attempts to reach Bario in Las Vegas. Those calls also resulted from a plant by the Government—in this instance a plant of misinformation which provoked interstate telephone calls that Wasserberger would not otherwise have made.[13] An additional ground for ruling out the abortive Las Vegas calls is that there was not and, under the circumstances, could not have been any actual use of a facility in interstate commerce which would in fact promote, etc., any unlawful activity. When Bario told Wasserberger that he could be reached at the Sahara Hotel, he knew that any attempt to reach him at the hotel would be frustrated. We refuse to construe the "intent" language of § 1952 so broadly as to include a call to an innocent telephone operator who had not the faintest idea of what was afoot.[14]

We are thus left only with Bario's call from Paris on April 25. That call was not planted in the sense that the Newark call was; the Government did not send Bario abroad for the sole purpose of making a foreign call. But, apart from the question, which we leave unresolved, whether a communication with an undercover agent can ever meet the requirement of § 1952(a), the Paris call rather precisely fits Judge Medina's characterization in United States v. Corallo, *supra*, 413 F.2d at 1325, of "a casual and incidental occurrence" and Mr. Justice Marshall's reference in *Rewis*, *supra*, 401 U.S. at 812, 91 S.Ct. at 1059, 28 L.Ed.2d 493, to "a matter of happen-

13. The Government contends that Bario gave Wasserberger the Sahara Hotel information "only after great pressure by Wasserberger and Klein to furnish a number." According to Bario's testimony, however, when Klein requested a number to call, Bario said that Wasserberger would know how to get in touch with him, and when Wasserberger asked for a number, Bario readily spun out the tale about leaving messages at the Sahara Hotel. Since the Government's assertion that the hotel story was invented "solely to maintain the credibility of Agent Bario as a Las Vegas mobster" is nowhere supported in the record, we need not decide whether the considerations mentioned in this footnote would lead to a different result if factually sustained.

14. We do not mean the foregoing to be taken as indicating that we would reach a different conclusion with reference to the Las Vegas calls if the operator had passed them on to Bario; we simply need not decide that issue.

stance." The call served no purpose that would not have been equally served by a call from New York; the most that can be said is that when the defendants made their despicable agreement with Bario, they were told he might be calling from across the Atlantic rather than the East River—a matter of complete indifference to them. Beyond all this is the question whether the *receipt* of an interstate or foreign telephone call, in no way initiated by a defendant, even though expected by him, is any more a violation of the Travel Act than the reception of Georgia gamblers by the Florida operators in *Rewis, supra,* 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493. In light of the principles controlling our decision, which we summarized at the conclusion of our discussion of the legislative history of the Travel Act, we hold that the Paris call was insufficient to transform this sordid, federally provoked incident of local corruption into a crime against the United States.

The convictions are reversed for insufficiency of the evidence to show a violation of, or a conspiracy to violate, the Travel Act, with instructions to dismiss the indictment.

## ON PETITION FOR REHEARING

### PER CURIAM:

Beginning with a nine-page description of the background alleged to have justified its setting up the crime with which defendants were charged, the Government attacks both what it characterizes as dicta in our opinion and the precise holding that the use of interstate and foreign telephone facilities in this case did not suffice to bring the defendants within the Travel Act.

Although the record does not contain proof of many of the facts now called to our attention by the Government for the first time as evidence of the background of its investigation, we do not question that the federal prosecutors had been given abundant information about the widespread fixing of cases in the Queens County District Attorney's office,[1] some of which, we are now told, may have involved conduct violating the Travel Act, 18 U.S.C. § 1952. We readily appreciate the justified indignation this aroused and can understand the consequent desire of federal law enforcement officials to clean these Augean stables of the State. That Archer has been dismissed from his post as a result of the Government's efforts is indeed a "good" result, as the petition repeatedly emphasizes. None of this, however, is relevant to the sole issue decided, namely, that the evidence here did not show a federal crime under a fair reading of the Travel Act.

The Government devotes much of its petition to issues which we felt desirable to ventilate in view of the appellants' arguments but were at pains neither to decide nor to pronounce dicta. Nine pages of the petition are devoted to an attempt to show that the Government agents committed no crimes and that what it chooses to call the "investigating technique" here employed "was entirely proper," although we expressly left "resolution of this difficult question for another day," 486 F.2d at 677. The final pages of the petition stoutly maintain that "The Government's investigation of local corruption in this case was a proper and necessary use of federal power." The case for this assertion

1. This came in principal part from a commission established in 1970 by Mayor Lindsay of New York City and chaired by Whitman Knapp, Esq., a distinguished lawyer who has since become a judge of the District Court for the Southern District of New York. According to the Government's petition, the Knapp Commission sought the assistance of the Department of Justice; the New York City Police Commissioner "thoroughly endorsed" a federal investigation of the Queens County prosecutor's office; and "the United States Attorney disclosed the plan to a member of the state judiciary with administrative responsibility over the state court system in Queens." While this lessens the offensiveness to the State of the conduct here at issue, local invitations cannot expand the constitutional and legislative limitations on federal criminal jurisdiction.

would certainly be stronger if, as the Government advises us now, as it did not in its brief or argument, there was reason to believe that the local corruption in Queens had involved some violations of the Travel Act. But we specifically declined to decide whether we could or should dismiss the prosecution as an abuse of federal power, 486 F.2d at 678. We thus need only consider Point I of the petition, in which the Government urges that we gave too narrow a reading to the Travel Act.

Despite the copious citation of cases, including many not included in its original brief, not one of the Government's citations supports application of the Travel Act where the sole "federal" elements were telephone calls from or to an undercover agent. Despite grave reservations whether interstate or foreign travel or transportation or use of interstate or foreign telephone facilities by an undercover agent, as distinguished from actual participants in the crime, can ever supply the federal jurisdictional basis required by the Travel Act, we left open the possibility that this might suffice when sufficiently pervasive or functional. Our holding was on the narrow basis that these conditions were not here fulfilled. In its petition for rehearing, the Government argues that there was at least evidence of an agreement to make interstate or foreign calls, thus justifying the conviction on the conspiracy count, and that legislative history and prior decisions require us to hold that the Las Vegas and Paris calls were sufficient to invoke the Travel Act. We disagree.

On the first point, the Government asserts that "Klein and Wasserberger had, before any actual travel or use of an interstate facility, agreed to use such facilities to promote the bribe." However, the Government greatly overstates the evidence as to the alleged agreement. The transcript of the tape recording of the critical conversation between Bario, Wasserberger and Klein reveals the following: Klein said he must have the bribe money in advance. For that purpose he needed a way to get in touch with Bario. Bario responded that he had no phone in Las Vegas and that he would be out of the country a great deal in the near future. He added that Wasserberger knew whom to call to ensure that the money would be there on time. "There are some people who know exactly where I am at all times," Bario assured Klein. That answer seemed to satisfy Klein, for he made no further inquiries concerning Bario's whereabouts.

Bario and Wasserberger then left Klein's office. The Government states that "Wasserberger and Bario agreed that Bario should call Klein directly to find out if Klein could guarantee that the case would be fixed." That characterization, however, is misleading. Actually, Bario independently proposed that he should call Klein, and he made no mention of where he would be at the time he intended to call. Contrary to the Government's assertion, Bario was given no instructions to call Klein's office on April 25 or any other date; in fact, when Bario called, Klein could only say that he would have some news for him the next day.

The Government insists that it was only after Klein and Wasserberger had exerted great pressure on Bario that he was forced to contrive a Las Vegas "cover." Yet the pretended Nevada connection had been part of the Government's plan from the first. Bario testified at trial that when Klein asked where he lived, he gave the Las Vegas address that the Government had originally supplied for him on his identification papers. Later, while Bario and Wasserberger were driving back to Manhattan, Wasserberger mentioned that he might someday want to visit Las Vegas. It was in response to Wasserberger's expression of interest in visiting him there that Bario volunteered he could be reached at the Sahara Hotel.

In light of this evidence, there is no indication that the defendants agreed either to make or to cause to be made

any interstate or foreign telephone calls. At the conclusion of the meeting, Klein expected that he could reach Bario by calling Wasserberger; through Bario's subsequent fabrication, Wasserberger learned—or thought he learned—that Bario could be reached at the Sahara Hotel, but no plans were made for Wasserberger to call him there. The Government points to no further evidence of any agreement.

Besides insisting that the defendants agreed to make interstate or foreign calls, the Government disputes our conclusion that the calls themselves were insufficient to invoke the Travel Act. While it has wisely abandoned its reliance on the Newark calls, it contends that Bario's call from Paris and Wasserberger's unsuccessful attempts to reach Bario in Las Vegas sufficed to meet the jurisdictional requirements of § 1952. We disagree. The Nevada calls are of no jurisdictional significance. Although the Government insists that those calls were not "planted," but were "suggested, pressed for and accomplished solely by the defendants without any encouragement by Bario and despite Bario's actively discouraging such calls," the evidence summarized above shows that Bario volunteered the story about reaching him at the Sahara Hotel, consistent with the Government's design to present him as a Las Vegas underworld figure. Moreover, while Wasserberger made the calls in an effort to convey information to Bario about the proposed bribe attempt, there was no possibility at any time that the calls could further the enterprise or even go through to the intended recipient.[2]

 The Government insists that the Paris call was one that the defend-ants "caused" Bario to make, but it is clear from the evidence outlined above that Bario made the call on his own initiative. The Government places great weight on the fact that Bario was in Paris on legitimate business and was not sent there solely to manufacture jurisdiction in this case. But that fact alone is not sufficient to qualify the Paris call. Any such holding would permit the Government to convert any local bribery it had provoked into a federal offense by furnishing an out-of-state address for an undercover agent or sending him outside the state on a legitimate errand and having a call made before the offense was consummated. The Travel Act confers ample power on federal law enforcement officers to assist local officials without going so far. Both the legislative history summarized in our opinion and the additional extracts relied on in the Government's petition show that the overriding Congressional purpose was to permit the federal government to act against members of organized crime whose activity crossed state lines when local law enforcement officers were unable or unwilling to do so—not to extend federal power to deal with corruption in local prosecutors' offices by affording the corrupters an opportunity to use interstate or foreign telephone facilities in dealing with an undercover agent on any such "casual and incidental" basis as here. See United States v. Corallo, 413 F.2d 1306, 1325 (2 Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969).

 While the Government professes alarm at the precedential effect of our decision, we in fact went no further than to hold that when the federal element in a prosecution under the Travel Act is

---

2. The Government cites United States v. Hedge, 462 F.2d 220 (5 Cir. 1972), as contrary to the result reached here. In that case the Mississippi-based defendants ordered numerous sets of dice from a Las Vegas manufacturing company for which one of them worked as a salesman. The dice arrived in the mail, but the defendants refused to pay for them and they were returned unclaimed. The court up-

held their Travel Act convictions even though there was no direct relationshp between the use of the mails and the subsequent unlawful gambling. Unlike the Las Vegas calls here, the dice shipment was a bona fide operation which, until the defendants refused delivery, had every prospect of promoting the gambling enterprise.

furnished solely by undercover agents, a stricter standard is applicable than when the interstate or foreign activities are those of the defendants themselves and that this was not met here. We adhere to that holding and leave the task of further line-drawing to the future.

The petition for rehearing is denied.