**UNITED STATES of America, Plaintiff–Appellee,**

v.

**John P. O'CONNOR, Defendant–Appellant.**

**No. 79–1496.**

United States Court of Appeals, Tenth Circuit.

Submitted Sept. 15, 1980.

Decided Dec. 19, 1980.

Sarah M. Singleton of Pickard & Singleton, Santa Fe, N. M., for defendant–appellant.

R. E. Thompson, U. S. Atty. and Don J. Svet, Asst. U. S. Atty., Albuquerque, N. M., for plaintiff–appellee.

Before BARRETT, DOYLE and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

John P. O'Connor was indicted under 18 U.S.C. § 2314 [1] and 18 U.S.C. § 2 [2] for aiding and abetting interstate transportation of stolen goods, and 18 U.S.C. § 371 [3] for conspiracy to transport stolen property in interstate commerce. Trial was held in the United States District Court for the District of New Mexico. The jury returned verdicts of guilty on both counts. O'Connor appeals those verdicts. We affirm.

## I.

The convictions stem from O'Connor's efforts to sell uranium oxide U–308, commonly called yellowcake. According to O'Connor, in addition to his ownership of a restaurant supply business, he worked as a finder, one who puts a buyer and a seller together for a fee. O'Connor was told by a Mr. Brown, with whom he had had prior dealings, that someone wanted to sell two barrels of yellowcake. O'Connor attempted to arrange a sale with several prospective buyers including, through an intermediary, a buyer from Idaho. At O'Connor's request, Edwin Hammon, another finder, contacted various people in the uranium business to see if they were interested in buying the uranium. One of these persons was William Wagner. Suspicious of the proposed terms of sale, Wagner went to the Federal Bureau of Investigations ("FBI"). When Wagner met with O'Connor and others to make the sale, the FBI was present and seized the barrels. The barrels had been stolen from the Sohio Natural Resources Mill near Seboyeta, New Mexico by Pete Lucero and Teofilo Savedra.

Subsequently, Lucero contacted O'Connor and asked him if he was interested in uranium Lucero had available. O'Connor agreed to find a buyer. O'Connor contacted a Mr. Marko, to see if he knew of a buyer. Unknown to O'Connor, Marko was an FBI informant. Marko made arrangements for O'Connor to meet with someone who supposedly worked in Montana for New Park Industries, a New Orleans company. That person was FBI agent Biederstedt.

Biederstedt and O'Connor met in New Mexico to arrange the sale. According to Biederstedt, he told O'Connor he would be purchasing the uranium for a foreign buyer in Caracas, Venezuela. It was agreed that final payment was to be made after the uranium was assayed in El Paso, Texas. Conflicting testimony was given whether delivery was to be made at the Vado Truck Stop in El Vado, New Mexico or in El Paso.

O'Connor told Lucero and Savedra of the arrangements. Lucero and Savedra drove the yellowcake to the truck stop in El Vado, where they met two men, who said to fol-

---

1. Section 2314 provides:
"Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud;

". . . .

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

2. Section 2 provides:
"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

3. Section 371 provides:
"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

low them. They followed the men to El Paso and were arrested. O'Connor was convicted for his participation in the sale.

O'Connor makes two claims on appeal. One is that the district court lacked jurisdiction to try the case because the interstate element of his offenses was manufactured by the FBI agents involved in the sale. The other is that the prosecution committed reversible error by asking a defense witness at trial if he had been convicted of a felony when the prosecutor knew otherwise. We find both arguments lack merit and affirm.

## II.

O'Connor alleges that the interstate element of his offenses, transportation of the uranium beyond the boundaries of New Mexico, was solely the product of federal agents. Based upon this contention, O'Connor asserts that the district court lacked jurisdiction to hear the case.

In so arguing, O'Connor principally relies upon *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973). The Second Circuit held that Congress did not intend to grant federal jurisdiction over cases in which "federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present." *Id.* at 682.

We find *Archer* inapposite. There federal investigators had devised a scheme to elicit criminal behavior from anyone who might be involved in corrupting New York's criminal justice system. A government agent was arrested on a phony charge and then made it known that he would be willing to pay a considerable sum to avoid trial

or conviction. *Id.* at 672. The defendant in *Archer* was prosecuted for having accepted the bait, but the Second Circuit found three interstate or foreign telephone calls insufficient to satisfy the interstate requirements of the federal statute under which he was convicted.[4] The court emphasized that two of the calls resulted from a government plant of misinformation which provoked interstate telephone calls the defendant would not otherwise have made. *Id.* at 682. The court considered the other call too casual and incidental an occurrence to "transform this sordid, federally provoked incident of local corruption into a crime against the United States." *Id.* at 683.

■ The circumstances in this case are far different. The FBI agents did not provoke interstate activity that O'Connor might not have otherwise done. O'Connor demonstrated a willingness to sell to any buyer, regardless of the possibility of interstate transactions. The uranium had been offered to a buyer in Idaho. The defendant admitted that he had discussed with Biederstedt selling the yellowcake to a foreign buyer and that the idea of its crossing state lines did not scare him. O'Connor knew that the yellowcake was going to be assayed in El Paso and the evidence reasonably supported the conclusion that he had agreed to delivery there.

We said in *United States v. Hall*, 536 F.2d 313, 327 (10th Cir. 1976), that *Archer* "is concerned with virtual entrapment," emphasizing that whether it is the defendant or "the authorities [who] took the initiative . . . makes a substantial difference."[5] *Id.* The FBI agents who dealt with O'Connor did not solicit the theft of uranium oxide. It was a uranium industry executive, his

---

4. The Travel Act, 18 U.S.C. § 1952, states:
   "(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
   (1) distribute the proceeds of any unlawful activity; or
   (2) commit any crime of violence to further any unlawful activity; or
   (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,-000 or imprisoned for not more than five years, or both."

5. The Second Circuit itself has restricted the scope of *Archer*. In *United States v. Gambino*, 566 F.2d 414, 419 (2d Cir. 1977), it said that *Archer* "spoke of a 'federally provoked incident of local corruption.'" The court upheld federal jurisdiction, finding that the federal scheme did not involve "entrapment." *See id.*

suspicions aroused by O'Connor's offer to sell yellowcake, who went to the FBI. It was O'Connor who contacted Marko, the FBI informant. The circumstances in this case certainly do not smack of "virtual entrapment."

The "casual and incidental" nature of the interstate phone calls was the other factor *Archer* emphasized in finding insufficient grounds for federal jurisdiction. 486 F.2d at 680, 682. The Second Circuit distinguished cases in which the use of interstate telephone calls had been the "fulfillment of an integral part" of a criminal plan. *Id.* at 680. Other cases have similarly rejected basing federal jurisdiction upon incidental, marginal, or unforeseen interstate activity. *See United States v. Isaacs*, 493 F.2d 1124, 1146–49 (7th Cir. 1974); *United States v. McCormick*, 442 F.2d 316, 318 (7th Cir. 1971); *United States v. Altobella*, 442 F.2d 310, 315 (7th Cir. 1971).

■ In this case, the interstate activity was an integral rather than an incidental aspect of the transaction. O'Connor knew that the yellowcake was to be assayed in El Paso. Assaying was a necessary step in the arrangement, for the buyer had to have assurance that he was receiving what he was paying for. The delivery of the uranium to El Paso was thus not unforeseen. There was in fact substantial evidence indicating that El Paso was actually chosen as the delivery point. No evidence was introduced by O'Connor that a location in New Mexico would have been a more logical place to assay the ore.

■ We agree with the defendant that in grounding federal criminal jurisdiction on an interstate nexus we must avoid "alter[ing] sensitive federal–state relationships" through usurpation of state control over local matters. *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). *See also United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). That danger simply is not present here.

### III.

In an effort to impeach the credibility of Edwin Hammon, a defense witness, the prosecution asked him on cross–examination whether he had ever been convicted of a felony. O'Connor contends that in asking this question the Government committed reversible error because it knew the question was without basis in fact.

We reproduce the interchange between Hammon and the prosecutor:

"Q. Have you ever been convicted of a felony, Mr. Hammon?

"A. No, I have not.

"Q. Let me show you a document. Tell me if that's you or not?

"A. Yes, it is.

"Q. You were convicted, were you not, of making false and misleading statements in the sale of securities?

"A. Not of a felony, no.

"Q. Let me just ask you if you were convicted of that?

"A. Yes.

"Q. False and misleading statements?

"A. I said that; that is what I said. I was not convicted. I said that's what I did.

"Q. Well, in any case, you contend that your plea of guilty on making those types of statements was not a felony?

"A. I didn't know about it being a felony at the time.

"Q. Do you know now?

"A. No, I say it is not a felony. I have a letter in my pocket that states it is not a felony.

"Q. Let me see that. That's a letter from our office?

"A. Yes, it is.

"Q. But what you pled guilty to dealt with making a false statement, isn't it?

"A. I told someone something that was told to me and it ended up being a false statement, yes."

Rec., vol. IV, at 261–62.

The letter from the Assistant United States Attorney did state that "it is the

opinion of this office that Mr. Hammon stands convicted of a misdemeanor, not of a felony." Rec., vol. I, at 28. O'Connor cites several cases holding it improper for a prosecutor to ask a question that implies a factual predicate he knows he cannot support or that he has no reason to believe is true. *See, e. g., United States v. Harris,* 542 F.2d 1283, 1307 (7th Cir. 1976).

Whether Hammon was actually convicted of a felony is disputed, but we need not decide that. The prosecution had a right to impeach the witness by introducing the conviction whether the crime was a felony or misdemeanor because the crime involved dishonesty or false statement. *See* Fed.R.Evid. 609(a). The only issue we are concerned with is whether the characterization of the conviction as a felony, if false, prejudiced O'Connor's right to a fair trial. The cross–examination clearly revealed to the jury what Hammon had been convicted of, making false statements in the sale of securities. The record of Hammon's conviction was also left with the jury as an exhibit. In light of this, we think whether the crime was labeled a felony or a misdemeanor would be secondary in the jury's mind, the substance of the crime being their likely focus. More importantly, the jury had for its consideration as an exhibit the letter from the Assistant United States Attorney. That and the interchange between Hammon and the prosecutor, if anything, left the jury with the impression that Hammon had not been convicted of a felony.

We conclude that this incident, at most, was harmless error.

Judgment affirmed.