In the Matter of SALVATORE NIGRONE, Petitioner, *v.* JOHN M. MURTAGH, as a Justice of the Supreme Court, et al., Respondents.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* PAUL P. RAO, Defendant.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* PAUL P. RAO, JR., Defendant.

Second Department, December 13, 1974.

*Herald Price Fahringer* (*Lipsitz, Green, Fahringer, Roll, Schuller & James* of counsel), for petitioner.

*Saxe, Bacon, Bolan & Manley* (*Roy M. Cohn* and *Thomas A. Bolan* of counsel), for Paul Rao and another, defendants.

*Maurice H. Nadjari* (*Bennett L. Gershman* of counsel), respondent *pro se*, and for plaintiff.

CHRIST, J. Petitioner Nigrone and defendants Rao have been indicted for perjury in the first degree by a Grand Jury empaneled for an Extraordinary Special and Trial Term of the Supreme Court appointed by executive order pursuant to subdivision 1 of section 149 of the Judiciary Law. The Raos have moved in this court to dismiss their respective indictments, and Nigrone (also referred to herein as a defendant) has separately brought a proceeding pursuant to CPLR article 78 in the nature of prohibition, in which he also has asked for dismissal of his indictment. Permission for the making of such motions by the Raos and Nigrone has been granted pursuant to subdivision 2 of section 149 of the Judiciary Law.

Dismissal of the indictments is sought primarily upon the ground of prosecutorial misconduct and in the interests of justice. The facts are as follows: Pursuing allegedly specific information about corruption in the criminal justice system, the Special Prosecutor determined to " infiltrate " the system by setting up a simulated crime. A probationary officer from the Police Academy, using the name " Vitale ", was alleged to have stolen $8,200 from a businessman, with the aid of a gun, on November 1, 1973. Both the " victim " of this " armed

robbery '' and the arresting officer participated in the ruse. A false felony complaint was lodged against Vitale and he was arrested, fingerprinted and placed in jail pending arraignment and the setting of bail. Bail was eventually set at $10,000 by a Judge unaware of the ruse and Vitale was released. The Special Prosecutor's office also fabricated a false criminal record for Vitale, indicating that he had had two prior arrests.

Thereafter, through Vitale, the Special Prosecutor sent a woman, one '' Mrs. Gatti '', to contact Judge PAUL P. RAO, a Judge of the United States Customs Court. They met on November 12, 1973 and Mrs. Gatti, apparently an old family friend of the Raos who had not seen the Judge in some 40 years, asked his help on behalf of the son of dear friends (Vitale) who was in trouble with the law. Mrs. Gatti, although allegedly unaware of the Vitale hoax, was equipped with a tape recorder. Judge RAO referred Mrs. Gatti to his son, Paul P. Rao, Jr., a practicing attorney. That same day, Mrs. Gatti saw Rao, Jr., and arranged to have him meet with Vitale, and such a meeting also took place that day. Rao, Jr., agreed to represent Vitale in his pending robbery case.

On November 23, 1973 Vitale was indicted for robbery (two counts) and grand larceny (two counts) by a Kings County Grand Jury. Neither the grand jurors nor the Assistant District Attorney who presented the case knew that the whole thing was a sham and that in fact no such robbery had ever occurred. Vitale failed to appear in the Supreme Court for arraignment on the indictment and his $10,000 cash bail was declared forfeit. (Defendants claim that the nonappearance was caused by the improper removal of Rao, Jr.'s notice of appearance from the court files, but the Special Prosecutor denies that any such notice was in the files.) Nevertheless, Rao, Jr., was successful in having the bail forfeiture revoked and in staving off a detailed inquiry into whether the bail money was really '' the proceeds '' of the '' robbery ''. Rao, Jr., also procured a return of Vitale's $10,000 cash bail and had the bail reduced to $1,000. Again, none of the Supreme Court Justices before whom the bail matter was presented was aware that the entire case was a hoax.

In March, 1974 Rao, Jr., formally withdrew as Vitale's counsel on the stated ground that Vitale was insisting that he, Rao, Jr., '' fix '' the case for him.

In April, 1974 Judge RAO, his son Rao, Jr., and one of the latter's law partners, Salvatore Nigrone, were requested to appear before the Extraordinary Special Grand Jury which was, in fact, along with its broad study of corruption, investigating

whether these individuals had conspired with a Judge of the Civil Court of the City of New York and others to bribe a Kings County Supreme Court Justice in order to influence the proceedings in and the outcome of the Vitale robbery case. This Special Grand Jury was informed and was fully aware that there had been no Vitale robbery and that the case was a sham.

The defendants waived immunity and testified before the Special Grand Jury. The undercover agent Vitale and Mrs. Gatti also testified and tape recordings of conversations between all these individuals, surreptitiously made, were put into evidence.

In May, 1974 Judge RAO was indicted upon two counts of perjury for denying that he had ever told Mrs. Gatti how to handle her problem in affecting a Judge's actions in a criminal case or that she should handle the bail problem by getting a lawyer who knew the Judge. Rao, Jr., was indicted upon seven counts of perjury for denying that he had ever told Vitale that he would have to get money so that he would " know how to talk " to other people (who could quash his case); for denying that he had seen a Judge, other than the Judge presiding in the case, about the Vitale matter; for denying that he had ever seen anybody in the court system to obtain assistance in the Vitale matter; for denying that he had ever discussed with Vitale or anyone else whether a " hook was in " in the Vitale case; for denying that he had helped in creating a " phony " story or defense; for testifying falsely that, at the time of his first court appearance, he had no knowledge of any of the bail money being the proceeds of the robbery; and for falsely testifying that Vitale had never told him that his parents had not furnished the bail. Nigrone was indicted upon one count of perjury for testifying falsely that he had never asked Rao, Jr., if the " hook was in " in the Vitale case.

The underlying ground urged for dismissal of the indictments is prosecutorial misconduct. Thus, for example, it is claimed that during the course of his investigation, the Special Prosecutor himself committed numerous crimes, such as suborning perjury before the first Kings County Grand Jury, offering a false instrument for filing, and obstructing governmental administration. Stated in a slightly different light, the argument is that the Special Prosecutor has totally abused the criminal process by making the first Grand Jury and numerous Criminal Court and Supreme Court Judges unwitting players in the Vitale robbery charade.

There is no doubt whatsoever that, upon the facts here presented, the office of the Special Prosecutor has exceeded its proper prosecutorial function. The deception of grand jurors, Judges and Assistant District Attorneys and the filing of false official documents are absolutely intolerable. The criminal justice system operates to protect the individual from both unsubstantiated accusations of guilt and illegal or outrageous conduct by an overreaching prosecutor. It is an impartial arbiter, exercising its judgment, for the most part, after law enforcement authorities have completed their function of detecting crime and apprehending the alleged criminal. When, as here, the criminal justice system is made an unwitting accomplice of an overzealous prosecutor, before the fact, its impartiality is destroyed and contempt for the law encouraged.

The pernicious effect of the Special Prosecutor's conduct is nowhere better exemplified than in his misuse of the Kings County Grand Jury which indicted Vitale for robbery. The Grand Jury has historically been clothed with the responsibility of determining whether there is probable cause to believe a crime has been committed and protecting citizens against unfounded criminal prosecutions (*Branzburg* v. *Hayes,* 408 U. S. 665, 686–687). The Special Prosecutor, however, has used the Grand Jury for an entirely different purpose. The Vitale case was presented to it, not for a determination as to whether Vitale had, in fact, committed a crime for which he should be prosecuted, but rather to legitimize Vitale's undercover role as a criminal facing prosecution and to set in motion the events which would, in the Special Prosecutor's estimation, induce the defendants at bar to attempt to fix the criminal prosecution. The grand jurors and the Assistant District Attorney presenting the case were unwittingly made to play a part in the Special Prosecutor's scheme to induce these defendants to commit a crime. Such a perversion of the criminal justice system by an overzealous prosecutor is illegal, outrageous and intolerable and we condemn it. If the justice system is to have any usefulness, it must be respected and believed. The necessary confidence cannot be preserved when grand juries and Judges are duped in charades composed of lies and deceptions fabricated by the law officers of the State.

It is not an answer to say that, in searching out crime, deception is often required to bring offenders to justice. Such deception, however permissible when dealing with suspected criminals, is never justified when dealing with grand juries, trial juries, or Judges whose burden is the search for truth. Though

the purpose of the Special Prosecutor may be laudable, he is not above the law and may no more resort to corruption and manipulation of the criminal justice system than the individuals he seeks to prosecute.

Governmental misuse of power breeds only apathy, contempt and more lawlessness, a lesson recently and painfully relearned. In the words of Justice Brandeis, written 46 years ago (*Olmstead* v. *United States*, 277 U. S. 438, 485 [dissent]): "Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means — to declare that the Government may commit crimes in order to secure the conviction of a private criminal — would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face."

Having condemned the misconduct of the prosecutor, we now consider whether this so taints the proceeding that the indictments must be dismissed. This is indeed a separate and independent question. The heart of our decision rests upon whether such misconduct can be a defense to an otherwise good indictment by a duly constituted fully informed grand jury investigating corruption in the criminal justice system. We find the indictments are valid on their face and charge the commission of crimes.

No such defense is permissible. The power of the grand jury is broad in finding facts upon which indictments are to be predicated and, in the public interest, witnesses before it under oath must make truthful answers. There can be no temporizing with or softening of this requirement. No person called before a duly constituted grand jury may be permitted to have any excuse to lie. A witness must know at once that if he perjuriously testifies before such a body he will be punished.

The testimony in question and upon which the indictments are based was not the testimony before the Kings County Grand Jury which had returned the Vitale indictment, but rather it was before the Special Extraordinary Grand Jury investigating corruption. This Grand Jury, in its quest for evidence of an evil

distortion of the criminal justice system, was seeking to learn if there had been an attempt to influence the proceedings in the Vitale case and this was only a part of the larger and broader responsibilities of its investigation. It was seeking to discover if a conspiracy had existed between a Civil Court Judge and others to bribe a Supreme Court Justice. In the course of this investigation, it was legitimate and necessary from the disclosures on the tapes to have the defendants appear in person before the Grand Jury as witnesses. This segment of the investigation was limited to the Vitale matter, and the Grand Jury was entitled to truthful answers under oath from the witnesses.

The defendants do not claim entrapment or violation of any of their personal constitutional rights. Indeed, nothing the Special Prosecutor did, no matter how offensive, could have induced or licensed them to commit perjury. Still, the defendants ask us to dismiss these indictments as the fruit of the poisonous tree or, simply, as a matter of due process. We see no reason in law or fundamental fairness to do so.

The exclusionary rule was born of the need to deter widespread violations of individual constitutional rights guaranteed by the Fourth Amendment of the Constitution of the United States. Its prime purpose is deterrence from or prevention of abuse by the law enforcement agencies; it is not to provide a remedy for the injury suffered by the search victim (*United States* v. *Calandra,* 414 U. S. 338, 347). In this case there has been no violation of any of the defendants' constitutional or otherwise cognizable rights. We pay respect to the statement that "the true administration of justice is the firmest pillar of good Government". Nothing can be more important. The integrity of the courts must be preserved and, when this has been put in question to the point that an executive order of the Governor has been made directing an investigation of possible corruption in the criminal justice system, the courts must not reach out to frustrate or hinder such investigation.

As members of the judiciary, we are particularly sensitive to, and disturbed by, allegations of corruption in the justice system. We are also mindful of the difficulties involved in investigating judicial corruption and bringing offenders to justice. We will not hamper this investigation by the Special Grand Jury into the conduct of Judges and other officers of the courts by an unprecedented extension of the exclusionary rule.

We believe that our condemnation of the prosecutorial misconduct in this *sui generis* case will suffice to prevent its repetition. Should the Special Prosecutor disregard the admonitions

here expressed, it still remains within the executive power to take appropriate action.

The more generalized bar to prosecution on due process grounds, as urged upon us by the defendants, originally arose as a problem of overzealous law enforcement in the context of the entrapment defense. As recently reaffirmed by the Supreme Court in *United States* v. *Russell* (411 U. S. 423), the focus of that defense, which is not asserted here, is still the predisposition of the defendant to commit the crime charged and not whether the Government instigated the crime or the police conduct fell below acceptable standards for the proper use of governmental power. The *Russell* court recognized, as do we, that there may be some " conduct of law enforcement agents * * * so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction " (*id.*, pp. 431–432), but this is not such a case. The Special Prosecutor did not manufacture or participate in the defendants' alleged perjury. He did supply them with an opportunity to commit bribery and, through his agents, actively attempted to induce its commission, but that conduct was negligible once the Special Grand Jury entered the picture. It was then that a new and independent inexcusable wrong was allegedly committed.

The grand jury has broad investigative powers and its operation is generally unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials (*United States* v. *Calandra*, 414 U. S. 338, 343, *supra*). " It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime " (*Blair* v. *United States*, 250 U. S. 273, 282). Indeed, it may even pursue an investigation *sua sponte*, on the basis of the personal knowledge of the grand jurors, or follow up upon mere tips and rumors.

The broad scope of the grand jury's investigative power is complemented and implemented by the duty of every citizen to give his evidence before such body upon request (*Branzburg* v. *Hayes*, 408 U. S. 665, 682, 688, *supra*). Here, the Special Grand Jury was investigating corruption in the criminal justice system in Kings County. The Special Grand Jury was fully aware of the manner in which the Special Prosecutor had conducted his investigation, and of its results, and could justifiably conclude

that the defendants had relevant evidence to give. The defendants, however, inexcusably sought to frustrate the investigation by denying the Special Grand Jury the benefit of their truthful testimony, or so the indictments charge. Although not strictly applicable in this context, our State Constitution provides (art. I, § 6): "The power of grand juries to inquire into the wilful misconduct in office of public officers, and to find indictments or to direct the filing of informations in connection with such inquiries, shall never be suspended or impaired by law."

The allegedly perjured testimony given in this case effectively abridged the Special Grand Jury's power to inquire into official corruption in the criminal justice system and the defendants may not be relieved of the consequences of their independent wrong by confusing the actions and roles of the Special Prosecutor with the Special Grand Jury.

It should be noted that neither Judge RAO nor Paul Rao, Jr., has challenged the legal sufficiency of the evidence before the Special Grand Jury to establish the commission of the offenses charged or any lesser included offense; and we express no view thereon. Defendant Nigrone has raised such an issue and, upon examination of the Grand Jury minutes, we find that the evidence is sufficient to require a denial of his motion to dismiss the indictment. We have considered the other contentions raised by these defendants and find them to be without merit.

Further, we decide only that the indictments may not be dismissed upon the arguments urged by the defendants. We do not have before us and we do not pass upon the question of the guilt or innocence of the defendants. This is reserved for trial.

In accordance with all the foregoing, the motions should be denied, and the article 78 proceeding dismissed on the merits, without costs.

SHAPIRO, Acting P. J. (dissenting). My learned associate Mr. Justice CHRIST, writing for the majority, aptly says that " when, as here, the criminal justice system is made an unwitting accomplice of an overzealous prosecutor, before the fact, its impartiality is destroyed and contempt for the law encouraged," that the "pernicious effect of the Special Prosecutor's conduct is nowhere better exemplified than in his misuse of the Kings County Grand Jury which indicted Vitale for robbery," that " if the justice system is to have any usefulness, it must be respected and believed," that the " necessary confidence cannot be preserved when Grand Juries and Judges are duped in charades composed of lies and deceptions fabricated by the law officers of the State" and that " upon the facts here presented,

the office of the Special Prosecutor has exceeded its proper prosecutorial functions'' by conduct which is '' absolutely intolerable,'' but he then goes on to say that '' we believe that our condemnation of the prosecutorial misconduct in this *sui generis* case will suffice to prevent its repetition.''

The condemnation of the Special Prosecutor's conduct meets with my wholehearted approval, but the majority's condonation of the result of that conduct — the indictment of these defendants — is to me completely inexplicable; nor can I agree, for the reason hereafter pointed out, that the present judicial condemnation of the Special Prosecutor's conduct '' will suffice to prevent its repetition ''.

To point up specifically what is stated in somewhat general terms in the majority opinion, I desire to point out some, but not all, of the numerous acts of unquestioned impropriety committed by the Special Prosecutor.

When he arranged to have Vitale arrested and fingerprinted; when he arranged fabricated prior convictions to make it appear that Vitale was a repetitive felon; when he arranged to have him arraigned before a Judge of the Criminal Court of the City of New York, charged with the crime of robbery, and then permitted bail to be fixed for him on that charge; when he permitted a '' phony '' complainant to appear before the Grand Jury and testify to a '' robbery '' which had never taken place; when he permitted an Assistant District Attorney who did not know the facts to present that '' complainant '' to the Grand Jury so that an indictment would be returned; and when he permitted Vitale to be arraigned as a genuine defendant before a Justice of the Supreme Court — the Special Prosecutor may then well have been guilty of aiding in the commission of a number of felonies, such as perjury in the first degree (swearing falsely before a grand jury), in violation of section 210.15 of the Penal Law; forgery in the second degree (falsifying public records), in violation of section 170.10 of the Penal Law; making an apparently sworn false statement in the first degree (intended to mislead a public servant in the performance of his official functions), in violation of section 210.40 of the Penal Law; offering a false instrument for filing in the first degree, in violation of section 175.35 of the Penal Law; falsely reporting an incident in the first degree (reporting to a law enforcement agency information known by him to be false), in violation of section 240.60 of the Penal Law; and various misdemeanors falling under sections 210.45, 190.25, 195.00, 195.05 and 215.10 of the Penal Law.

In answer to all of this the Special Prosecutor says that his conduct was "neither improper nor illegal * * * as there was never an intention to violate laws." This open and blatant assertion of nonculpability flies in the face of the undeniable facts, among many others, that the Assistant District Attorney intended to present a real and not a "phony" case to the Grand Jury; that he did not intend to have the complainant swear to tell the truth, the whole truth and nothing but the truth, *and then have the witness tell an unsuspecting Grand Jury a tissue of lies deliberately prepared by the Special Prosecutor to mislead the Grand Jury into returning an indictment against Vitale.*

The myopic view of the Special Prosecutor with regard to his conduct destroys the contention of the majority that we have here a *sui generis* case and that its condemnation "will suffice to prevent its repetition". In this connection it should be remembered that almost exactly the same kind of conduct was severely condemned in *United States* v. *Archer* (486 F. 2d 670), a case in which the Special Prosecutor here participated *amicus curiae.*[1] Judge FRIENDLY, writing for a unanimous court, there said:

"This case arises from what the Government characterizes as 'part of an intensive combined Federal and local investigation into the nature and extent of corruption within the New York criminal justice system.' Its brief tells us that the investigation 'was premised on the belief that attempts to combat corruption in the criminal justice system'—to wit, New York City's—'through uncovering incidents of past wrongdoing had failed.' It was essential, the Government insists, to arrange 'undercover penetration into ongoing corrupting activities' by having 'a federal agent assume the role of a potential consumer of corruption.' *We do not at all share the Government's pride in its achievement of causing the bribery of a state assistant district attorney by a scheme which involved lying to New York police officers and perjury before New York judges and grand jurors*" (p. 672).

"In this case the Government argues, its conduct did not infringe the rights either of the defendants or of any third parties; see fn. 5. *Yet the Government agents displayed an arrogant disregard for the sanctity of the state judicial and*

1. Despite that fact we still find the Special Prosecutor defending his conduct, for at page 5 of his supplemental affirmation he asserts that "the procedures utilized by the Office of the Special Prosecutor in the investigation complained of were in every manner fair, reasonable and proper and in no way violated any rights of the defendants."

*police processes.* The investigators apparently permitted their deserved contempt for corrupt practitioners in the Queens criminal justice system to spill over into disdain for all the participants in the system—including the police, the courts, and the members of the grand jury, all of whom were subjected to the Government's fabrications. While this pattern of deception may be less serious than some forms of governmental participation in crime that can be hypothesized, it is substantially more offensive than the common cases where government agents induce the sale of narcotics in order to make drug arrests.

" *Since we conclude reversal to be required on another ground, we leave the resolution of this difficult question for another day. We hope, however, that the lesson of this case may obviate the necessity for such a decision on our part* " (emphasis supplied; p. 677).

That condemnation was uttered on July 12, 1973 (rehearing denied on September 26, 1973). However, it is sadly apparent that the lesson of that case was *not* learned, for " the following November" in complete defiance of that condemnation " the Office of the Special Prosecutor caused to be arrested an undercover police officer posing as a robber named Stephen Vitale " and then proceeded to direct the hoax which eventuated in Vitale's indictment by an unsuspecting Grand Jury. As a result we are now met in this case with the necessity " for such a decision on our part " (*United States* v. *Archer, supra,* p. 677).

It is because "governmental misuse of power breeds only apathy, contempt and more lawlessness," as the majority points out, that the indictment returned against these defendants by a Grand Jury investigating the "Vitale" case should be dismissed, for in truth and in fact there was no "Vitale" case, only a phantom indictment of a phantom defendant allegedly named Vitale.

Some of the members of the Grand Jury which returned the indictments in these three cases in their lay way instinctively expressed the same thoughts, for we find one juror saying: " It wasn't a question. It was just a statement of judgment that I think was shared by several of us. There is very little doubt that there has been perjury committed. However, we are supposed to be an anticorruption jury, seeking corruption, and in this particular case there seems to be very little corruption. Lying, yes: *But it was like a setup* to see whether or not a man is going to tell the truth or not. And it's a very, very difficult thing as far as I'm concerned " (emphasis sup-

plied). And a second grand juror thereafter observed: "I think what's bothering some of the jurors—I may be wrong—is the connotation here that a trap was set. Is that true? Entrapment, I guess they call it." While the doubts thus mentioned were temporarily stilled by the equivocal answer of the Assistant Special Prosecutor, there can be no question that the purpose of bringing the defendants before the Grand Jury was to set them up.

To analogize the situation here with infiltration by the police into criminal projects actually being committed by prospective defendants, as does the Special Prosecutor, merely beclouds the issue. Infiltration by deceit *without the utilization of the judicial process* may well be necessary in the never ending and legitimate war against crime, but despoliation of the fountain of justice itself must be refused sanction as violative of every sense of decency, enlightened public policy and a due regard for the observance of good morals and ethical conduct. Furthermore, as must be clear to the Special Prosecutor, in the infiltration cases "the criminal activity in which the Government agents participated was the very activity for which the defendant was prosecuted" (*United States* v. *Archer,* 486 F. 2d 670, 675, *supra*).

A dismissal of the indictments here would not hamper proper investigative procedures,[2] but would serve notice that Javert type techniques which utterly disregard basic constitutional rights, violate statutory law and constitute an intrusion on those rights which we as a free people hold most dear may not be perpetrated with impunity. We must set our face unalterably against lawless law enforcement as a proper device to be used by prosecutors even if their motives be of the best—for sanctioning them can only have a chilling effect on proper law enforcement and result in the eventual erosion of many of our basic constitutional rights. In language clearly applicable to the conduct of the Special Prosecutor in this case and the indictments he here obtained, the court in *Rochin* v. *California* (342 U. S. 165, 169, 172) said: "Regard for the requirements of the Due Process

---

2. The only recorded case of an attempt to prostitute the judicial processes in the manner here attempted by the Special Prosecutor is in *United States* v. *Archer (supra)*. The annals of American Jurisprudence since the adoption of the first ten amendments to the Constitution of the United States in 1791 have been free of any such prosecutorial conduct, or, more properly stated, misconduct, for the Special Prosecutor has referred to no case in which such methods were used. If in all these 183 years Federal and State prosecutors have been able to properly perform their duties, it ill behooves this Special Prosecutor to take the position that only by transgressing the law can he make a "breakthrough" against corruption.

Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings * * * in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses ' * * * Applying these general considerations to the circumstances of the present case, we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct which shocks the conscience.''

In *United States* v. *Toscanino* (500 F. 2d 267, 271) the court discussed the cases of *Ker* v. *Illinois* (119 U. S. 436) and *Frisbie* v. *Collins* (342 U. S. 519), which laid down what has come to be known as the *Ker-Frisbie* rule, and said: '' For years these two cases have been the mainstay of a doctrine to the effect that the government's power to prosecute a defendant is not impaired by the illegality of the method by which it acquires control over him. This teaching originated almost 90 years ago in *Ker*.''

It then continued: '' Since *Frisbie* the Supreme Court, in what one distinguished legal luminary describes as a ' constitutional revolution,' see Griswold, The Due Process Revolution and Confrontation, 119 U. Pa. L. Rev. 711 (1971), has expanded the interpretation of ' due process.' No longer is it limited to the guarantee of ' fair ' procedure at trial. *In an effort to deter police misconduct, the term has been extended to bar the government from realizing directly the fruits of its own deliberate and unnecessary lawlessness in bringing the accused to trial* (citing cases; p. 272; emphasis supplied). * * *

'' ' *It has long since ceased to be true that due process of law is heedless of the means by which otherwise relevant and credible evidence is obtained* * * * Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend a '' sense of justice.'' ' 342 U. S. 169, 172–173 (p. 273; emphasis supplied). * * *

'' *Society is the ultimate loser when, in order to convict the guilty, it uses methods that lead to decreased respect for the law* (p. 274; emphasis supplied). * * *

'' In *United States* v. *Archer, supra,* while basing our decision on other grounds, we referred to *Olmstead* and *Rochin* for the proposition that due process principles might be invoked to

bar prosecution altogether where it resulted from flagrantly illegal law enforcement practices (p. 274). * * *

"In light of these developments we are satisfied that the 'Ker-Frisbie' rule cannot be reconciled with the Supreme Court's expansion of the concept of due process, which now protects the accused against pretrial illegality by denying to the government the fruits of its exploitation of any deliberate and unnecessary lawlessness on its part. Although the issue in most of the cases forming part of this evolutionary process was whether evidence should have been excluded (e.g., *Mapp, Miranda, Wong Sun, Silverman*), it was unnecessary in those cases to invoke any other sanction to insure that an ultimate conviction would not rest on governmental illegality. Where suppression of evidence will not suffice, however, we must be guided by the underlying principle that the government should be denied the right to exploit its own illegal conduct, *Wong Sun* v. *United States,* 371 U. S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)" (p. 275).

In *Russell* v. *United States* (411 U. S. 423, 430, 431–432), a drug entrapment case, the court in sustaining a judgment of conviction pointed out that the government agent did not "violate any federal statute or rule *or commit any crime* in infiltrating the respondent's drug enterprise" (emphasis supplied) but then, citing *Rochin* v. *California* (342 U. S. 165, *supra*), Mr. Justice REHNQUIST significantly added that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction".

With all due respect to the majority, this is that case, for I cannot accept the premise of the majority that the proceedings before the Kings County Grand Jury and the Special Extraordinary Grand Jury stand in isolation from each other. The majority, in this connection, argues that the latter Grand Jury was ". seeking to learn if there had been an attempt to influence the proceedings in the Vitale case," but there was no Vitale case — only a sham indictment. Curiously enough, the majority entirely disregards the fact that the basis for each of the three indictments is the factual existence of a real Vitale case, for each indictment reads in pertinent part: "The Grand Jury has been conducting an investigation to determine whether the defendant had conspired with a Judge of the Civil Court of the City of New York and others to bribe a Kings County Supreme Court Justice in order to influence proceedings in, and the outcome of, the robbery case of *People* v. *Vitale,* which was

pending in Kings County ". Thus, the attempt to erect a Berlin wall between the "Vitale indictment" and these indictments does not withstand analysis. The majority, in further attempting to buttress its argument, then says that the Special Grand Jury "was seeking to discover if a conspiracy had existed between a Civil Court Judge and others to bribe a Supreme Court Justice" and that "the allegedly perjured testimony given in this case effectively abridged the Special Grand Jury's power to inquire into official corruption in the criminal justice system," but the singular and undeniable fact is that these defendants in their appearance before the Grand Jury were not asked a single question with regard to any bribes. Instead, the questions they were asked were clearly and purposefully designed to get them to deny what they previously had said — and which was contained on tapes in the possession of the Special Prosecutor — so that they could be threatened with perjury indictments and then be "squeezed" by him for the bribery information which he sought. Upon the argument of these applications it was admitted that before the hand-up of the instant indictments a conference was held with at least one of the defendants, seeking to accomplish that end.

The majority also argues that "in this case there has been no violation of any of the defendants' constitutional or other cognizable rights," but the fact is that "the pernicious effect of the Special Prosecutor's conduct" (the majority's language) invaded not only the rights of these defendants but that of every man, woman and child in this State. I wholeheartedly agree with the majority that "the true administration of justice is the firmest pillar of good Government" and that "nothing can be more important." It is for that very reason that these indictments, founded on a pretense and a sham, should not be permitted to befoul the records of our courts. In thus contending, we are not seeking "an unprecedented extension of the exclusionary rule," but rather a rule that the courts themselves not approve indictments resulting from an "unprecedented" and illegal exercise of power by the Special Prosecutor.

No amount of shadowy rhetoric can obscure the fact that the indictments here depend for their utility upon the validity and genuineness of the Vitale proceedings, for, as above noted, each of them alleges that the perjury was committed "to influence proceedings in, and the outcome of, the robbery case of *People v. Vitale*."

In *Mapp* v. *Ohio* (367 U. S. 643, 654–655) the court decided "to close the only courtroom door remaining open to evidence

secured by official lawlessness.'' We should not reopen that door by approving the results of the '' official lawlessness '' of the Special Prosecutor's conduct — the indictments here obtained by him.

If nothing else, our recent national tragedy should teach us that we dare not temporize with a '' Plumbers Squad-Watergate '' mentality which believes that a government agent may violate the institutional integrity of our judicial system and prostitute its legal processes in order to achieve his end. Respect for law is not fostered when prosecutors, who think they can do no wrong because they are on the side of right, themselves engage in shabby and ignoble practices. There is danger to all of us, innocent and guilty alike, when abuse of power is replaced by the power of abuse. Decoys may be used to catch criminals *but not if they require performance of criminal acts on the part of those themselves sworn to uphold the law,* for that would be authorizing unlawful use of the law (cf. *People* v. *Benford,* 53 Cal. 2d 1, 9; and see, on this general subject, La Fave & Scott, Criminal Law [1972], pp. 369–374; Perkins, Criminal Law & Procedure [4th ed., 1972], pp. 700–710). Decency and the law should never be at war with each other.

Finally, while we do not question the devotion of the Special Prosecutor to the tremendous task which he has undertaken under his designation by the Governor, we cannot help but note that throughout history tyrants have invariably supported their actions by the claim that they were acting in the public interest. To sanction the result of the prosecutor's conduct here while plaintively decrying what he did would deprive the words '' due process '' of any real meaning, would justify the cynicism about our judicial system now too widely, and unjustifiably, held and would leave little incentive for this or other prosecutors to act within the bounds of legal propriety.

To summarize, we have here a fantasy concocted into a web of perjury and subornation of perjury, the profanation of a sacred institution — the Grand Jury (in Kings County) — by making it the unknowing participant in a fraud causing it to return an indictment for a crime that never took place upon '' evidence '' placed before it by a District Attorney who believed he was, in fact, prosecuting an atrocious criminal act, followed by the Supreme Court itself becoming an unknowing actor in the Special Prosecutor's scenario, all of which was deliberately framed to set a background for the Special Prosecutor's next intended move — the current indictments. To refuse dismissal of the indictments here would negate the historic role which

our judiciary has always played as a defender of constitutional rights. (See *Kinsella* v. *Singleton,* 361 U. S. 234, 246, where the court condemned conduct of governmental law enforcement agents which was violative of " ' fundamental fairness, shocking to the universal sense of justice.' ")

When a tree is poisoned at the roots one cannot, by severing the fruit from the tree, free the fruit of its poisonous content. Therefore, since the indictments in this case rest squarely upon the poisoned proceedings which brought about the Vitale indictment, the entire structure must fall and the indictments should be dismissed.[3] In so concluding we do not reach the merits of the tainted indictments per se; nor is our vote for dismissal in any way to be viewed as approval of the conduct of the defendants.

COHALAN and MUNDER, JJ., concur with CHRIST, J.; SHAPIRO, Acting P. J., dissents and votes to grant the relief sought, in opinion in which BENJAMIN, J., concurs.

Motions denied, and proceeding dismissed on the merits, without costs.

---

3. The Special Prosecutor, relying upon my concurring opinion in *Matter of Klein* v. *Murtagh* (44 A D 2d 465, 473–474, affd. 34 N Y 2d 988), also contends that "the issue relating to the propriety of the procedures utilized in the investigation is raised prematurely," but in that case I merely said that "the determination of those questions cannot properly be made on an application for an order in the nature of prohibition." Here, the defendants are moving pursuant to permission granted by this court under subdivision 2 of section 149 of the Judiciary Law to dismiss the indictments in the interests of justice on the ground of prosecutorial misconduct and, in addition, defendant Nigrone has asked for an order of prohibition.

Furthermore, the Special Prosecutor, in citing my statement in the *Klein* case, omitted to note that I there spoke of "*the lawless conduct of the investigators*" (emphasis supplied) and that I, joined by a majority of my colleagues, found myself "in general agreement with the disapproval voiced by Judge FRIENDLY in *United States* v. *Archer* (486 F. 2d 670) of the prosecutorial conduct of the Government (both State and Federal) " (id., p. 473). In addition, it should be noted that the basic facts alleged by the movants in seeking dismissal of the instant indictments are not disputed.