THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EDWARD D. ISAACSON, Appellant.

Fourth Department, February 25, 1977

*Peter Bradstreet* for appellant.

*John M. Finnerty* for respondent.

DILLON, J. Defendant, a graduate student and teacher at Penn State University, was convicted by the court, without a jury, of criminal sale of a controlled substance in the first degree (Penal Law, § 220.43), a class A felony, and was sentenced to a minimum period of imprisonment of 15 years to life. It is not disputed that on January 4, 1975 the defendant, while under police surveillance, sold a substantial quantity of cocaine to a police informant.

To put this case in perspective, it is appropriate to review the history of drug activity among the central participants. John D. Breniman, the informant who made the purchase of cocaine upon which defendant's conviction is based, testified that he had known defendant for about two years before the transaction of January 4, 1975; that he had visited defendant's Pennsylvania apartment on several occasions; and that he had made prior drug purchases from defendant. He also testified that on December 4, 1974, the day before he was arrested in Steuben County for possession of amphetamines, he purchased 1,000 pills which he believed to be amphetamines, a gram of cocaine and one or two grams of PCP from defendant in Pennsylvania. While it later developed that these pills were not a controlled substance, he asserted that defendant told him that they were "black beauties" and he paid defendant between $220 and $240 for the pills.

Breniman admitted that over a period of time he had used amphetamines, sedatives, hallucinogens, marijuana and heroin, and that he had sold drugs to others. He had a prior Chemung County conviction for felony possession of marijuana which was pending on appeal. On December 5, 1974 he was arrested for felony possession of amphetamines and shortly thereafter he expressed a desire to work with the State Police as an informant. On December 20, 1974 he discussed with his attorney his possible informant's role and its effect not only upon the charge with which he was then confronted but also upon the prior Chemung County conviction.

While it is conceded that the State Police officers who arrested Breniman on the amphetamine charge learned from a laboratory report on December 23, 1974 that Breniman did not in fact possess a controlled substance, they did not so advise Breniman until he had completed his work as an informant in this case. It is further conceded that Breniman did not communicate to the State Police his desire to work as an informant until December 24, 1974. He was thereafter released from jail to commence making drug purchases under police supervision.

In addition to police witnesses, and two others who were called to prove that the crime was committed in New York State, one Denise Marcon, an habitual drug user who had known defendant for four years and had lived with him for two years immediately prior to the date of the crime, also testified on behalf of the People. She said that she knew Breniman, had seen him in defendant's apartment on prior occasions, had observed drugs in the defendant's apartment on five occasions in the fall of 1974, had watched defendant weigh drugs in his "laboratory", may have seen him selling drugs to others, and that the vial of cocaine she had in her possession at the time of defendant's arrest was given to her by defendant. She further testified that in the fall of 1974, while she was living with defendant, she used cocaine and marijuana every day; LSD when it was available; speed once or twice a week; and quaaludes two or three times a week.

The defendant testified that he lived with Denise Marcon for three years; that he never saw her use any drugs, except marijuana; and that he did not know that she was using so many drugs until he heard her testify. While he admitted the cocaine transaction for which he was charged here, he denied any prior drug sales to Breniman or anyone else. He stated that he had smoked marijuana; that he had done so in his apartment with Breniman; and that he had used LSD twice and cocaine on five or six occasions. He acknowledged identifying pills for Breniman as "black beauties" but denied that he sold them to Breniman.

With that drug-related background we proceed to the other relevant facts which gave rise to this charge. Upon his release from jail to work as an informant, and between December 25, 1974 and January 4, 1975, Breniman made seven long distance "collect" calls to the defendant. Three of such calls were made on January 4, 1975, the date of the crime. In the same

time frame the defendant telephoned Breniman at least once. All of these calls essentially related to Breniman's professed desire to purchase a large amount of drugs from defendant. Though the defendant at first told Breniman that nothing was available that would be worthwhile, in a later conversation defendant told Breniman that he would check into getting cocaine for him. Finally, defendant agreed to deliver two ounces of cocaine to Breniman for $1,800 an ounce. The price was later set at $1,900 an ounce in consideration of defendant's agreement to deliver the cocaine to Lawrenceville, Pennsylvania, located immediately south of the New York State border. The defendant would not engage in a drug transaction in New York because, according to his testimony, New York drug laws are "outrageous".

Indeed, it appears that when the cocaine was actually delivered to Breniman in New York State, the defendant believed that the transaction was taking place in Pennsylvania. The record demonstrates that the State Police and Breniman arranged for this drug transaction to occur at a location in New York State which, by its physical characteristics, appeared to be Pennsylvania.

The defendant was ingenious in devising a method of delivery of the cocaine to Breniman and took precautionary measures not generally employed by one unskilled in drug trafficking. He arranged to have Denise Marcon drive an automobile which contained the cocaine, and he drove a separate vehicle, carrying on his person only a small sample of his wares. He also carried with him under his shirt, a plastic bag containing a nonnarcotic substance which appeared to be cocaine because he was concerned about a possible "rip-off".

By prearrangement, defendant and Breniman met at the Whiffle Tree Tavern in the Town of Lindley, New York. Defendant gave Breniman a sample of the cocaine which Breniman took to a State policeman who was waiting outside of the tavern. The State policeman gave Breniman $1,900 which was to be delivered to defendant with instructions to Breniman to tell defendant that the other half would be paid when the first half of the cocaine was examined. It was upon delivery of the $1,900 to defendant that Breniman was first told by defendant that the narcotics were with Denise Marcon in another car across the street. Defendant, with Breniman in the car, drove to a point alongside the car operated by Denise Marcon, and she handed the cocaine through the respective

car windows to Breniman. Thereafter both defendant and Denise Marcon were placed under arrest.

While the defendant raises several issues on this appeal, only four are worthy of review. He first contends that the court erred in denying his motion under CPL 210.40 to dismiss the indictment in the interests of justice. CPL 210.40 provides that an indictment may be dismissed in furtherance of justice when "such dismissal is required as a matter of judicial discretion by the existence of some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant * * * would constitute or result in injustice". Thus the question of whether an indictment should be dismissed in furtherance of justice is addressed to the discretion of the Trial Judge. While that discretion is clearly not absolute, the issue on appeal is whether the court abused or improvidently exercised its discretionary authority (People v Wingard, 33 NY2d 192; People v Belkota, 50 AD2d 118; People v Kwok Ming Chan, 45 AD2d 613; People v Marco, 44 AD2d 574). The statute requires the court to make a "value judgment * * * based upon a 'sensitive' balancing of the interests of the individual and the State" (People v Belkota, supra, p 120, citing People v Clayton, 41 AD2d 204, 208).

While the efficacy of CPL 210.40 in its present form has recently been the subject of concern in the Court of Appeals (People v Belge, 41 NY2d 60) to the extent that it continues to permit the exercise of judicial discretion, its application "should be narrowly confined, [and] rarely exercised" (JASEN, J., dissenting, p 64). Moreover, our Legislature has determined that the nature of defendant's crime represents a grave threat to society (see People v Broadie, 37 NY2d 100, cert den 423 US 950).[1]

On this record, in our view, the trial court properly exercised its discretion in denying the motion. While we recognize that the defendant is a student, undergraduate instructor and doctoral candidate, facts, incidentally, which should not militate in his favor in the context of this case, the trial testimony clearly established that the defendant was not only experienced in the drug culture, but that he spent part of his time

---

1. For a contrary view and a discussion of the properties of cocaine and its effect upon users (see Commonwealth v Miller, 20 CrL 2331 [Dec. 28, 1976] and State v Erickson, — P2d —, 20 CrL 2350 [Dec. 22, 1976]).

in the sale of narcotics. The evidence of his guilt is overwhelming; his criminal activity reveals careful forethought and execution; and the record reasonably supports a conclusion that his motivation for the crime was personal profit. Additionally, viewed even from this distance, we find that his trial testimony was not credible.

Defendant next urges that the evidence substantiates his defense of entrapment. In light of recent decisions of the Supreme Court in *United States v Russell* (411 US 423) and *Hampton v United States* (425 US 484), we will consider defendant's argument in conjunction with his further claim that he was denied due process of law.

We note first that the New York entrapment defense derives from the Federal standards enunciated in *Sorrells v United States* (287 US 435) and *Sherman v United States* (356 US 369). It is not available to one who regularly engages in a criminal enterprise (Hechtman, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law, § 40.05, p 125). Thus evidence of other criminal acts of a defendant may be introduced on the People's case-in-chief in order to refute the defense of entrapment *(People v Mann,* 31 NY2d 253). Such conduct shows that the defendant was "otherwise disposed to commit [the offense]" (Penal Law, § 40.05).

Without reciting the trial court's findings, it is sufficient to note that the record amply supports its determination that the defendant was predisposed to commit the offense for which he was charged. While it is clear that defendant did not intend to enter New York to sell cocaine but intended only to sell it in Pennsylvania, the fact that he was lured into New York is of no avail to him as regards this statutory defense.

Indeed, recognizing that the defendant should not succeed in his entrapment defense, the dissent focuses on the "reprehensible" nature of the police conduct as a denial of "due process", all the while conceding that "the defendant in this case committed the crime for which he has been adjudged guilty". While it is clear from the decisions in both *United States v Russell (supra)* and *Hampton v United States (supra),* that the defense of entrapment is not available where the defendant is predisposed to commit the crime, a defense otherwise labeled (e.g., due process) might well be appropriate where the police overinvolvement in crime reaches a "demonstrable level of outrageousness" *(Hampton v United States, supra,* POWELL and BLACKMAN, JJ., concurring, 491,

495, n 7; cf. BRENNAN, STEWART and MARSHALL, JJ., dissenting, 495, 497).[2]

In both *Russell* and *Hampton* the Supreme Court affirmed judgments of conviction. In both cases there were complaints of substantial police misconduct. In *Russell,* police agents furnished an ingredient not itself contraband but used in the unlawful manufacture of menthamphetamine. In *Hampton,* the government allegedly supplied the defendant with the drug which was the corpus delicti of the crime. In the latter case, in writing that the "Government's role [had] passed the point of toleration", Mr. Justice BRENNAN noted that "[t]he Government [was] doing nothing less than buying contraband from itself through an intermediary and jailing the intermediary". *(Hampton v United States, supra,* p 498.) The conduct of the police here was substantially less egregious than the conduct complained of in either *Hampton* or *Russell.*

One may reasonably find from this record that defendant's role as a seller of narcotics could have its impact on New York citizens. Contrary to the view of the dissent, and acknowledging that the defendant had not before sold drugs in New York State, we may not conclude that the sale of his wares in Pennsylvania foreclosed their later distribution and use in New York. While we do not encourage New York police to solicit peculiarly foreign sellers of narcotics to set up shop in our State, we will not foreclose their obvious legitimate interest in the flow of contraband adjacent to our borders.

Although we deplore, if true, any unnecessary physical restraint or abuse of the informant by the police, and we find equally reprehensible the failure of law enforcement officials to advise the informant of the negative chemical analysis in his own case, neither of these events bore directly upon the informant's original decision to work for the police. It may be that he would have changed his mind had he known the test results, but that is not before us. Moreover, there is nothing in the record which shows any correlation between the alleged physical abuse and the informant's co-operation. Indeed, Breniman testified that he did not become an informant because of any threat of physical harm.

In any event, defendant's due process argument is founded upon the improper conduct of the police in their relationship

---

2. Mr. Justice POWELL, however, emphasized that "the cases, if any, in which proof of predisposition is not dispositive will be rare" *(Hampton v United States, supra,* p 495, n 7).

with Breniman. Due process considerations "come into play only when the Government activity in question violates some protected right of the *defendant" (Hampton v United States,* 425 US 484, 490, plurality opn, emphasis in original; see, also, *Matter of Nigrone v Murtagh,* 46 AD2d 343, 349, affd 36 NY2d 421). It is not urged by the defendant that any such protected right was violated here.

While it is true that the police are charged with full knowledge of the actions of their informant *(Sherman v United States,* 356 US 369, 373-375), the conduct of neither the police nor Breniman is so outrageous as to " '[shock] the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment" *(United States v Russell, supra,* p 432).

Finally, defendant contends that the mandatory sentence provided for in section 70.00 of the Penal Law constitutes cruel and unusual punishment as applied to him. The minimum period of imprisonment for a class A-I felony conviction is not less than 15 years (Penal Law, § 70.00, subd 3, par [a], cl [i]) and the maximum term is life imprisonment (Penal Law, § 70.00, subd 2, par [a]).

In connection with this argument we note that the Court of Appeals, in passing upon the former mandatory sentence provisions for a class A felony in section 70.00 of the Penal Law ruled that "[r]egardless of its severity, a sentence of imprisonment which is within the limits of a valid statute ordinarily is not cruel and unusual punishment in the constitutional sense" *(People v Jones,* 39 NY2d 694, 697).

Subsequent to the 1973 amendments to section 70.00 of the Penal Law which amendments subdivided class A felonies into A-I, A-II and A-III classifications and provided separate minimum periods of imprisonment for each classification, the Court of Appeals determined that the mandated minimum and maximum periods of imprisonment for class A-II and class A-III felonies do not constitute cruel and unusual punishment and are not grossly disproportionate punishments *(People v Broadie,* 37 NY2d 100, cert den 423 US 950). The *Broadie* conclusion is equally applicable to the sentencing provisions for conviction of a class A-I felony *(People v Riley,* 50 AD2d 823). Beyond that, however, defendant nonetheless asserts that his is a "rare case [and that] on its particular facts * * * the statutes have been unconstitutionally applied" to him *(People v Broadie, supra,* p 119). In the circumstances of this

case, we find no merit to defendant's argument. Both the defendant and his offense "fit the statutory definition of the offender class [and] are also encompassed by legitimate penological purposes as envisioned by the Legislature" *(People v Broadie, supra,* p 119).

The judgment of conviction should be affirmed.

CARDAMONE, J. P. (dissenting). The question presented by this case is whether a conviction in New York's continuing war against drug abuse is valued so highly that a court should countenance a scheme by police agents which lures a resident of a sister State, innocent of any criminal activity in New York, into this State solely for the purpose of inducing him to commit a crime in New York and then punish him by a 15-year to life sentence. In our view the enticement of a sister State resident into this State solely for the purpose of arresting him for a transaction which would not have occurred absent the instigation and fraudulent subterfuge by an agent acting for and at the behest of the police falls below permissible limits of proper governmental conduct.

The facts may be briefly stated. The defendant, Edward Isaacson, a resident of State College, Pennsylvania, came into New York as the result of urgent and repeated entreaties by one J. A. Breniman, an acquaintance of several years' standing, who was at that time serving as an agent of the New York State Police. Mr. Breniman had been arrested on December 5, 1974 for possession of a large quantity of what Mr. Breniman believed were amphetamines. He was charged in a local criminal court with an A-2 felony and was incarcerated until December 24. However, prior to this release, the State Police solicited and obtained his aid as an informant. He testified that his reason for becoming a police informant was his arrest for what he was led to believe was an A-2 felony and his desire to obtain a bargaining position for himself.

Breniman testified that at the time of his arrest, a State Police officer struck him in the presence of two other uniformed officers because he refused to answer a question, knocked him out of his chair, kicked him in the ribs when he was down and threw the chair at him. The inside of his mouth and forehead were cut. He added that as he was leaving the station, this same police officer threatened to throw him down the steps and shoot him. Another B.C.I. investigator testified that after Breniman was arrested he observed that his forehead was cut. After being held in the Steuben County jail

without bail for approximately two weeks he was told he was facing a 15-year to life sentence and that if he co-operated with the police he would be released from jail. Immediately after his release he went to work to set up drug buys for the same officer who struck and threatened him. At this same time the police had received a lab report and discovered that the "contraband" for which Breniman had been arrested was caffeine and, therefore, not a controlled substance and that instead of facing an A-2 felony charge, Breniman was not guilty of any illegal possession. Despite having this crucial information, the police failed to inform Breniman of this fact. Instead they allowed Breniman to continue to work as their agent under the belief that he could avoid serving a previous marijuana conviction and bargain on his no longer viable A-2 charge.

After three unsuccessful attempts to set up drug buys for the police in New York State, Breniman called the defendant, with whom he had previous dealings. Breniman's calls to the defendant in Pennsylvania were born of desperation and panic. He related his arrest, that he was beaten by the police, was without friends, needed money for a lawyer and was facing a 15-year to life sentence in Attica. Breniman asked the defendant to get some heroin which defendant refused to do. Finally, when defendant agreed to come, the police furnished Breniman with the money necessary to buy cocaine which defendant was to bring. The defendant, Edward Isaacson, is a 26-year-old graduate student and teacher at the undergraduate level at Penn State University on the verge of earning his Ph.D. in plant physiology and biochemistry. He has no previous criminal record.

Our system of justice is founded upon a basic commitment to respect the rights of all persons and serves as an assurance to them that they remain free to make choices without coercion or fraudulent deception by police authorities. Prosecution in this case should be barred because the undisputed and, in fact, conceded governmental action is so shocking to our sense of fairness that it must be held to violate standards of due process. Regardless of the defendant's predisposition, when the government, through its agents, engages in reprehensible conduct the judicial focus must be on the police conduct. In such an inquiry the defendant's actions are not controlling. A majority of the United States Supreme Court have recently stated that where police misconduct may be

characterized as "outrageous" a conviction is subject to dismissal on due process grounds. *(Hampton v United States,* 425 US 484, 491-495, POWELL, J., and BLACKMUN, J., concurring; 495-500; BRENNAN, J., STEWART, J., and MARSHALL, J., dissenting; see, e.g., *Rochin v California,* 342 US 165.) This is consistent with the Supreme Court's statement that "[w]e are duly mindful of the reliance that society must place for achieving law and order upon the enforcing agencies of the criminal law. But insistence on observance by law officers of traditional fair procedural requirements is, from the long point of view, best calculated to contribute to that end" *(Miller v United States,* 357 US 301, 313).

Eminent jurists have expressed similar sentiments where police conduct falls below the proper standard for the exercise of governmental power. "Public confidence in the fair and honorable administration of justice, upon which ultimately depends the rule of law, is the transcending value at stake" (FRANKFURTER, J., concurring; *Sherman v United States,* 356 US 369, 380); "apart from the Constitution the Government ought not to use evidence obtained and only obtainable by a criminal act * * * I think it a less evil that some criminals should escape than that the Government should play an ignoble part" (HOLMES, J., dissenting; *Olmstead v United States,* 277 US 438, 469-470). "The Government may set decoys to entrap criminals. But it may not provoke or create a crime and then punish the criminal, its creature. * * * This prosecution should be stopped * * * in order to protect the Government. To protect it from illegal conduct of its officers" (BRANDEIS, J., dissenting; *Casey v United States,* 276 US 413, 423, 425).

Assuming, *arguendo,* that no relief were available, on these facts, under the due process clause of the Fourteenth Amendment, as authoritatively construed by a majority of the Justices of the United States Supreme Court, New York State, nevertheless, "is free *as a matter of its own law* to impose greater restrictions on police activity than those [the Supreme Court] holds to be necessary upon federal constitutional standards." *(Oregon v Hass,* 420 US 714, 719; see, e.g., *Cooper v California,* 386 US 58, 62; *Michigan v Mosley,* 423 US 96, 120 [BRENNAN, J., dissenting].)[1] Greater strictures on police con-

---

1. Thus, for example, in *State v Opperman* (247 NW2d 673), an automobile inventory that was upheld by the United States Supreme Court in *South Dakota v Opperman,* 428 US 364, as being reasonable under the Fourth Amend-

duct are derived, despite the similarity of language between our State Constitution and the Federal Constitution, because of the independent nature of the New York Constitution (see, e.g., *State v Opperman,* 247 NW2d 673, 674-675 [SD]).

Regardless of whether the State governmental misconduct here is in derogation of defendant's due process right under the Federal Constitution, section 6 of article I of the New York Constitution contains its own due process protections which the courts of this State should zealously safeguard. Thus, the reprehensible police conduct established upon this record violates this defendant's due process rights. Similarly, a number of State and Federal courts have dismissed convictions predicated on an intolerable degree of creative governmental participation (see, e.g., *People v Turner,* 390 Mich 7; *Grossman v State,* 457 P2d 226 [Alaska]; *United States v Chisum,* 312 F Supp 1307 [CD Cal]; *State v Mullen,* 216 NW2d 375 [Iowa]).

Moreover, it is within the inherent power of the court to supervise the administration of justice. As Mr. Justice BRENNAN stated in his dissent in *Hampton (supra,* p 497): "I agree with Mr. Justice POWELL that *Russell* does not foreclose imposition of a bar to conviction—based upon our *supervisory power* or due process principles—where the conduct of law enforcement authorities is sufficiently offensive, even though the individuals entitled to invoke such a defense might be 'predisposed.'" (Emphasis supplied.) Reviewing the propriety of police practices which encourage a particular defendant to commit a crime lies within the broad ambit of that power. In fact the court has a duty to scrutinize closely the conduct of the police and its agents to determine whether their conduct is a "proper use of governmental power" *(Accardi v United States,* 257 F2d 168, 172-173; *People v Joyce,* 47 AD2d 562, 564; Tiffany, McIntyre and Rotenberg, Detection of Crime, 265-272 [Report on police practices sponsored by the American Bar Foundation]; ABA Standards Relating to the Administration of Criminal Justice, Compilation, p 20; Goldstein, For Harold Lasswell: Some Reflections on Human Dignity, Entrapment, Informed Consent and The Plea Bargaining, 84 Yale L J 683, 687-690). After reviewing the instant record, we are

---

ment, was held unreasonable under the State Constitution by the State Supreme Court. (See, generally Brennan, State Constitutions and the Protections of Individual Rights, 90 Harv L Rev 489 (1977); Howard, State Courts and Constitutional Rights in the Day of the Burger Court, 62 Va L Rev 873.)

convinced that the police conduct is "sufficiently offensive" to compel this court to impose a bar to the conviction as an exercise of its supervisory powers.

Concededly, the defendant in this case committed an act for which he has been adjudged guilty. But, since the police conduct is also conceded, the controlling question to be determined on this appeal is whether the offensiveness of the police conduct falls below minimum standards of due process. Considering the police conduct in the context of due process, it is appropriate to consider the role of the police in a democratic society. The objectives of the police encompass the preservation of life and property, protection of the constitutional rights of citizens and the maintenance of respect "for the rule of law by proper police enforcement thereof" and thereby the preservation of a free and democratic society (ABA Standards, Compilation, p 16). One searches this record in vain to find any justification for the outrageous police conduct here engaged in, or indeed, any benefit derived by the People of New York through the activities of its agents. In fact, with the amount of crime presently extant in this State, it does not make much sense that New York police and those working in co-operation with them manufacture a crime in this State in order to arrest and punish a resident of another State.

We recognize fully that the power to overturn a conviction upon the ground that law enforcement agents engaged in impermissible conduct should be exercised sparingly and only in rare cases. Nonetheless, when such practices are revealed, they are firmly subject to due process limitations. Applicable here is the ancient maxim—the end does not justify the means. In our view the police conduct in this case so far departs from those values which our government is designed to protect that it becomes the duty of the courts to refuse to countenance it despite the conceded violation of the State Penal Law.

Accordingly, we dissent and vote to reverse the judgment of conviction and to dismiss the indictment.

SIMONS and WITMER, JJ., concur with DILLON, J.; CARDAMONE, J. P., and GOLDMAN, J., dissent and vote to reverse the judgment and dismiss the indictment in an opinion by CARDAMONE, J. P.

Judgment affirmed.